**No. 25-60383**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

Chelsea Jade Knighton,  Plaintiff -- Appellee

v.

Benton County, Mississippi; Kathy Graves, officially and individually; Robert Goolsby, officially and individually; Steve Belew, officially and individually,

Defendants – Appellants

---

**On Appeal from**
United States District Court for the Northern District of Mississippi

3:22-CV-56

---

**BRIEF OF APPELLANT KATHY GRAVES**

---

SUBMITTED BY:

Daniel J. Griffith, MSB #8366
Katherine P. McClellan, MSB #105718
Jacks Griffith Luciano, P.A.
150 N. Sharpe Avenue
P.O. Box 1209
Cleveland, MS 38732
dgriffith@jlpalaw.com
katie@jlpalaw.com

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Chelsea Knighton | Daniel Waide of Johnson, Ratliff & Waide Hattiesburg, MS |

| Appellants: | Counsel for Appellants: |
|---|---|
| Steve Belew | Wilson Minor of Office of the Attorney General Jackson, MS, appellate counsel |
| Steve Belew | James Hall of Office of the Attorney General Jackson, MS, trial counsel |
| Benton County, Mississippi | Robert Dambrino of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Benton County, Mississippi | Wesley Pinson of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Robert Goolsby | Robert Dambrino of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Robert Goolsby | Wesley Pinson of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Kathy Graves | Daniel Griffith of Jacks Griffith Luciano, P.A. Cleveland, MS, trial and appellate counsel |

i

| Kathy Graves | Katherine McCellan of Jacks Griffith Luciano, P.A. Cleveland, MS, trial and appellate counsel |
| --- | --- |

| **Other Interested Parties:** | |
| --- | --- |
| District Court Judge Michael P. Mills | |
| Magistrate Judge Roy Percy | |
| | |

*/s/Katherine P. McClellan*
Attorney of record for Kathy Graves

ii

## Statement Regarding Oral Argument

This is an appeal from a denial of qualified immunity where the district court never once mentioned qualified immunity, considered all the defendants as one, and never performed a clearly established analysis. Under the Court's precedent, at a minimum, reversal is required. Still, Kathy Graves welcomes the opportunity to orally discuss the district court's analytical and substantive errors in denying QI.

**TABLE OF CONTENTS**

Contents                                                                                    Page(s)

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ............................................................................. v

JURISDICTIONAL STATEMENT ....................................................................... x

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ......................................................................... 1

SUMMARY OF THE ARGUMENT ..................................................................14

ARGUMENT.................................................................................................16

CONCLUSION ..............................................................................................48

CERTIFICATE OF SERVICE...........................................................................50

CERTIFICATE OF COMPLIANCE....................................................................51

# TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE**

*Adams v. Travelers Indem. Co. of Conn.,*
465 F.3d 156, 164 (5th Cir. 2006)..................................................................28

*Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001) ...............26

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Durate,*
481 U.S. 537, 545 (1987).........................................................................35

*Bennett v. Grand Prairie,* 883 F.2d 400, 407 (5th Cir. 1989) ...............................34

*Black v. N. Panola Sch. Dist.,* 461 F.3d 584, 588 n.1(5th Cir. 2006).........37, 52, 54

*Blanchard-Daigle v. Geers,* 802 F. App'x 113, 119 (5th Cir. 2020) ......................26

*Blankenship v. Buenger,* 653 Fed. Appx. 330, 335 (5th Cir. 2016)..................23, 25

*Brown v. Lyford,* 243 F.3d 185, 189 (5th Cir. 2001)..........................................32

*Brown v. Miller*, 631 F.2d 408, 411 (5th Cir. 1980) ...........................................23

*Buehler v. Dear,* 27 F.4th 969, 980, n.13 (5th Cir. 2022) ........................22, 33, 42

*Burnikel v. Fong*, 886 F.3d 706, 710 n.3 (8th Cir. 2018)................................ 47-48

*Bustillos v. El Paso Cty. Hosp. Distr.,*
891 F.3d 214, 222 (5th Cir. 2018).................................................................44

*Bustos v. Martini Club*, 599 F.3d 458, 464 (5th Cir. 2010)..................................23

*Carr v. City of Spring Valley Vill.,* 2022 U.S. App. LEXIS 13307,
at *12 (5th Cir. May 17, 2022)....................................................................31

*Cole v. Hunter,* 497 F. Supp. 3d 172, 190 (N.D. Tex. 2020) ...............................37

*Cty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) .....................................27

*Cunningham v. Castloo,* 983 F.3d 185, 191 (5th Cir. 2020) ................................42

*District of Columbia v. Wesby,* 583 U.S. 48, 63-64 (2018)........................43, 44, 46

*Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977) .............................. 38-39

*Farrell v. Montoya,* 878 F.3d 933, 937 (10th Cir. 2017) .......................................44

*Garza v. Escobar,* 972 F.3d 721, 734 (5th Cir. 2020)..............................................49

*Guthrie v. J.C. Penny Co.*, 803 F.2d 202, 210-11 (5th Cir. 1986)..........................50

*Hawkland v. Hall,* 860 Fed. Appx. 326, 328-329 (5th Cir. 2021)................6, 21, 49

*Hodorowski v. Ray,* 844 F.2d 1210, 1216 (5th Cir. 1988) ............................... 38-40

*J.R. ex rel. R.R. v. Malley,* 62 So. 3d 902, 906-07 (¶15) (Miss. 2011) ...................51

*Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993) ..................51

*Johnson v. Hollins,* 716 F. App'x 248, 253 n.8 (5th Cir. 2017) .............................42

*Johnson v. Thibodaux City*, 887 F.3d 726, 732-733 (5th Cir. 2018) ......................30

*Jones v. City of Hattiesburg,* 2021 U.S. Dist. LEXIS 121127,
at *64 (S.D. Miss. June 28, 2021) ........................................................................32

*Jones v. City of Hattiesburg,* 228 So. 3d 816, 819, n.5 (Miss. Ct. App. 2017).......50

*Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020).....................................43, 46

*Lampton v. Diaz,* 661 F.3d 897, 899 (5th Cir. 2011) .........................................6, 49

*Liberty Mutual Ins. Co. v. Louisiana Dept. of Ins.,*
62 F.3d 115, 117-18 (5th Cir. 1995).....................................................................47

*Little v. Collier,* 759 So. 2d 454, 457 (Miss. Ct. App. 2000) ................................51

*Lopez v. Shiroma,* 668 F. App'x 804, 806 (9th Cir. 2016) ....................................48

*McClendon v. City of Columbia,* 305 F.3d 314, 322-23 (5th Cir. 2002) ...............26

*McClinton v. Delta Pride Catfish, Inc.,* 792 So. 2d 968, 973 (Miss. 2001)............52

*McDonald v. McCelland,* 779 F. App'x 222, 225 (5th Cir. 2019) .........................47

*Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) ......................................................26

*Moore v. City of E. Cleveland*, 431 U.S. 494, 505 (1977) ......................................40

*Morales v. Lee*, 668 S.W.2d 867, 869 (Tex. App. 1984, no writ) .........................31

*Morgan v. Chapman, 969 F.3d 238, 247 (5th Cir. 2020)* ......................................38

*Morgan v. Swanson,* 659 F.3d 359, 371-72 (5th Cir. 2011)...................................45

*Morris v. Dearborne,* 181 F.3d 657, 671 (5th Cir. 1999) ......................................39

*Morrison v. Means*, 680 So. 2d 803, 806 (Miss. 1996).........................................51

*Morrow v. Meachum,* 917 F.3d 870, 874-76 (5th Cir. 2019) ............... 43, 44, 46, 48

*Moton v. City of Clarksdale,* 2023 Miss. LEXIS 91, *6 (Miss. April 6, 2023) ......50

*Mullenix v. Luna,* 577 U.S. 7, 12 (2015) ...............................................................45

*Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992)............................................27

*Nassar v. Concordia Rod and Gun Club, Inc.,* 682 So. 2d 1035 (Miss. 1996).......53

*Nerio v. Evans,* 974 F.3d 571, 575 (5th Cir. 2020)..........................................44, 45

*Norris v. Williams*, 776 F. App'x 619, 622 (11th Cir. 2019) .......................... 46-47

*Pearson v. Callahan,* 555 U.S. 223, 236 (2009).....................................................42

*Perry v. Durborow*, 892 F.3d 1116, 1126 (10th Cir. 2018) ...................................46

*Rainer v. Wal-Mart Assocs. Inc.,* 119 So. 3d 398,
403-04 (Miss. Ct. App. 2013) .......................................................................... 50-51

*Randle v. Lockwood*, 666 F. App'x 333, 336 (5th Cir. 2016) ...................21, 22, 47

*Reichle v. Howards,* 566 U.S. 658, 665 (2012) ....................................................45

*Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) ...........................................43, 44

*Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 2 (2021) ............................................45

*Rizzo v. Goode,* 423 U.S. 362, 375-77, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976).....27

*Roberts v. United States Jaycees,* 468 U.S. 609, 617 (1984) ................................35

*Rolf v. City of San Antonio, Tex*., 77 F.3d 823, 827 (5th Cir. 1996)......................35

*Salazar-Limon v. City of Houston*, 826 F.3d 272, 277-78 (5th Cir. 2016) .......23, 26

*San Francisco v. Sheehan*, 135 S. Ct. 1765, 1778 (2015)......................................45

*Saucier v. Katz*, 533 U.S. 194, 200 (2001) ...........................................................26

*Screws v. U.S.*, 325 U.S. 91, 111 (1945)...............................................................23

*Seals v. McBee*, 2019 U.S. Dist. LEXIS 98552, at *6 (E.D. La. June 12, 2019) ....32

*Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).........................................54

*Smith v. Malouf*, 722 So. 2d 490 (Miss. 1998) .....................................................51

*Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001).................................................51

*Stanley v. Illinois*, 405 U.S. 645, 651 (1972)........................................................38

*State ex rel. Foster v. Turner*, 319 So. 2d 233, 235 (Miss. 1975) .........................53

*Strong v. Nicholson*, 580 So. 2d 1288, 1293 (Miss. 1991)....................................53

*Taylor v. Barkes*, 575 U.S. 822, 826 (2015) .........................................................45

*Thompson v. Clark,* 596 U.S. 36, 142 S. Ct. 1332, 212 L. Ed. 2d 382 (2022)........38

*Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)........................................27

viii

*Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453-54 (5th Cir. 1998) ..................6

*Tovar v. United States,* 2000 U.S. Dist. LEXIS 5044,
*21 (N.D. Tex. April 18, 2000)...............................................................31

*Trevino v. Hintz*, 751 Fed. Appx. 551 (5th Cir. 2018) ...........................................26

*Trevino v. Iden,* 79 F.4th 524, 531 (5th Cir. 2023) ..................................................33

*Troxel v. Granville*, 530 U.S. 57, 65 (2000) ...........................................................38

*Turner v. Driver*, 848 F.3d 678,692-93 (5th Cir. 2017).........................................30

*Vann v. Southaven*, 884 F.3d 307, 310 (5th Cir. 2018)................................... 42-44

*Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020) ..............................................22

*Walton v. City of Verona*, 82 F.4th 314, 320 (5th Cir. 2023) ...........................6, 22

*White v. Pauly*, 580 U.S. 73, 79-80 (2017)................................................42, 44, 46

*Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) ........................................48

*Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) ..........................................33

*Wooley v. Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000)............................39, 40

*Wyatt v. McDermott*, 283 Va. 685 (Va. 2012) .......................................................52

## STATUES AND AMENDMENTS                                          PAGE

Mississippi Code Annotated Section 15-1-35.........................................................49

28 U.S.C. § 1331.......................................................................................................6

28 U.S.C. § 1367.......................................................................................................6

42 U.S.C. § 1983.......................................................................................................6

U.S. Const. Amendment IV ....................................................................................27

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Knighton's Complaint was based on federal causes of action under 42 U.S.C. § 1983 and under 28 U.S.C. §1367 (a) for state law claims which were related to the same. ROA.17-32.  This Court has interlocutory-appellate jurisdiction over the district court's immunity denials.  *See Walton v. City of Verona*, 82 F.4th 314, 320 (5th Cir. 2023) (explaining that immunity from suit is "effectively lost if a case is erroneously permitted to go to trial").   This Court may also review denials of immunity under Mississippi law because the immunity is a protection from suit. *Id.* (citing *Lampton v. Diaz*, 661 F.3d 897, 899 (5th Cir. 2011) (per curiam)). Finally, this Court has pendant appellate jurisdiction over the remaining issues when an appealable order is "inextricably intertwined" with an unappealable order. *Hawkland v. Hall*, 860 Fed. Appx. 326, 328-329 (5th Cir. 2021) (quoting *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453-54 (5th Cir. 1998)). Kathy Graves timely filed her Notice of Appeal on July 15, 2025 for the denial of summary judgment on June 26, 2025. *Compare* ROA.2230-2231 *with* ROA.2209-2214.

x

## STATEMENT OF THE ISSUES

Kathy Graves moved for summary judgment, based in part on qualified immunity. When the district court entered its order denying the same, it never once mentioned qualified immunity in its denial, considered all the defendants as one, never conducted a clearly established analysis, failed to dismiss conceded claims, and failed to dismiss claims explicitly held to be "not actionable" by this Court. The ultimate questions here are whether Kathy had immunity for most Knighton's claims, whether federal or state, as well as whether summary judgment should have been granted on the remainder of the "inextricably intertwined" ones?

## STATEMENT OF THE CASE

### A. FACTS OF THE CASE

As the district court found "[t]he events that took place on February 2, 2021, spawn from a tumultuous familial relationship between mother-in-law, Kathy Graves, and now ex-daughter-in-law, Chelsea Knighton." ROA.2209. Prior to their divorce, Chelsea Knighton was married to Rob Graves. ROA.613. Rob Graves is Kathy Gaves's son. ROA.711 Meaning for years, Kathy Graves was Chelsea Knighton's mother-in-law.ROA.19,711.

Together Rob and Knighton have three children. ROA.608. At the time of this incident on February 2, 2021, however, only two had been born: Stephen, who was six, and Molly, who was two. ROA.608.

1

In addition to being Knighton's mother-in-law, Kathy also happens to be the long-time circuit clerk of Benton County, Mississippi. ROA.710. In her role as circuit clerk, Kathy is responsible for "run[ning] elections[,]" documenting the filings for both "civil and criminal court[,]" and "marriage licenses." ROA.710. Graves has never had any role drug testing during her 18-year tenure as circuit clerk. ROA. 724.

Unfortunately, Rob Graves has had a long running problem with drugs. ROA.711. Kathy has attempted to get Rob help through the years, including having him committed to the state hospital. ROA.711. Rob would get better for a little while, then he would fall off the wagon. ROA.711. Rob's drug use has been a consistent problem throughout Knighton and Rob's marriage. ROA.636.

Knighton has had her own issues in the past with addiction. ROA.613. In 2015, she checked herself into a rehab program for her addiction to pain pills. ROA.613. Knighton admitted that she has snorted Adderall and used cocaine. ROA.643-644.

In December 2018, "Corinth Police Department was notified by Wal-Mart employees as well as concerned citizens regarding" Rob and Knighton "who appeared to be under the influence and had [Stephen] with them. ROA.2263-72. One of the witnesses stated that the mother was seen in the restroom snorting crushed pills." ROA.2264. When CPS arrived at Wal-Mart both Rob and Knighton "were

under the influence and admitted to snorting pills." ROA.2264. And they were "too intoxicated to make a safety plan." ROA.2264. This led to Stephen being placed "in emergency custody… due to child neglect." ROA.2264. Both Rob and Knighton pled guilty to child neglect in Youth Court. ROA.616. Stephen was placed with Kathy. ROA.616, 2273. Stephen was eventually returned to his parents' custody almost a year later, on September 24, 2019. ROA.2292.

In August 2020, CPS was called out on Rob and Knighton again and both tested positive for marijuana, while both Stephen and Molly were in their custody and Knighton was breastfeeding. ROA.2274-80. In January 2021, just a month before this incident, Rob took a picture of Knighton, apparently passed out, with a plate of what appears to be lines of some type of narcotics in her hand. ROA.725-728.

On February 2, 2021, the day of the incident in question, Knighton, Rob, Stephen, and Molly lived together in Ashland, Mississippi in Benton County. ROA.613. "[T]hat morning, Kathy Graves received a phone call that her son, Robert Graves, was seen passed out in his car at a local gas station in Ashland, Mississippi." ROA.2209. According to Kathy, her nephew called and told her that Rob was passed out over his steering wheel at a local gas station and that "he thought [Rob] was dead." ROA.712. "As any concerned mother would do, Kathy abruptly left work

3

and raced over to the gas station." ROA. 2209-2210. But Rob had already left. ROA.712.

"With her son nowhere to be found, Kathy drove to Robert and Ms. Knighton's home hoping to find him there." ROA.2210, 713. According to Kathy, "I go and knock on the door, and he doesn't come. So I go to beating on the door to see, you know, what's going on because allegedly he was -- you know, almost [dead]." ROA.713, 2210.  Once "her son finally came out with Ms. Knighton following closely behind, allegedly cussing and screaming at him[,] Kathy told her son to get in the car." ROA.2210.

Once Rob got into the car, Kathy began to drive. ROA.713.  According to Kathy she was thinking " I don't know what I'm going to do, because he is really messed up. And if I take him to jail, there's nothing they can do." ROA.713. "Kathy began driving toward the Ashland square and saw Mississippi Department of Corrections Officer Steve Belew's car parked outside of his office. As the Benton County Circuit Clerk for the past 18 years, Kathy knew Officer Belew dealt with frequent drug offenders as a probation officer, so she went to him for help." ROA. 2210.

According to Kathy, she thought "Well, maybe he can give me some advice." ROA.713.  So that is where she took Rob. ROA.713.  It took approximately one minute to get from Rob's house to Officer Belew's office. ROA.713. During that

minute, Kathy had a " a lot" to say to Rob. ROA.713. "[I]t was a bunch of mama stuff[.]" Once they arrived at Belew's office, she told Rob: "We're going in to talk to Mr. Belew and see if he can't give us some advice of what to do with you." ROA.713.

At the office, "Officer Belew brought Robert into his office while Kathy remained in the waiting room. It was here that Robert admitted to using drugs and told Officer Belew that his wife Ms. Knighton, also under the influence of drugs, was passed out in the house with the children. Out of concern for the children, Officer Belew accompanied Robert and Kathy back to their home." ROA.2110.

The district court found that Knighton "maintains that on the morning of February 2, 2021, she was at home, awake and making coffee when Kathy, Robert, and Officer Belew arrived. Kathy and Officer Belew demanded that she take a drug test, but she told them to get out of her house." ROA.2211. "According to Ms. Knighton, Officer Belew aggressively forced her into a bathroom and stood over her while she tried to provide a urine sample but was unable to do so. He then escorted Ms. Knighton to the couch in the living room where he pinned her down with his knee, grabbed her face, pried open her mouth and forced an oral swab into her mouth." ROA.2211. "Although Officer Belew said the test was positive for opiates, he did not show Ms. Knighton the test and it was later determined the test kit used was expired." ROA.2211. Then, according to the lower court, "Ms. Knighton does

not remember exactly but either Officer Belew or Kathy told her that she would be arrested, and they left with both children." ROA.2211.

"Then, according to Ms. Knighton, Sheriff Robert Goolsby arrived at the home upon Kathy's request." ROA.2211. "Officer Belew informed Sheriff Goolsby that Ms. Knighton tested positive for opiates and admitted to using fentanyl. Based on this information, Sheriff Goolsby signed an affidavit swearing that Robert and Ms. Knighton had used drugs in the presence of their children and arrested Ms. Knighton." ROA.2211. "Sheriff Goolsby did not personally witness Ms. Knighton using drugs in the presence of her children, nor did he see the positive drug test. Ms. Knighton was tested multiple times after her arrest and never tested positive for drugs in a valid test. Nevertheless, based on the defendants' allegations, Ms. Knighton lost custody of her children for over a year and spent over a week in jail until she was released after the charges against her were dropped." ROA. 2211.

At the time that Kathy, Rob, and Officer Belew showed up at the home, both children- Stephen and Molly were in the house. ROA.614.

Knighton testified that Kathy did not touch her that day. ROA.642. And Knighton does not remember Rob ever asking his mother to leave. ROA.642. Knighton also testified that she does not remember Rob ever telling his mom the children could not go with her. ROA.642.

6

According to Sheriff Goolsby, Kathy called him and told him about Rob being passed out at the gas station that morning. ROA.743. "Kathy stated that she wanted [Goolsby] and CPS to come to Rob and Chelsea's home." ROA. 743. According to the Sheriff, he did not believe Kathy had been to Knighton's home at that point. ROA.753. The Sheriff's purpose in going was because Kathy "had found Rob passed out in the car." ROA.753. And Kathy had wanted CPS there so he "just assumed there was something going on with the kids as well." ROA.753. He did not recall Kathy telling him anything else that was going on. ROA.753.

When the Sheriff arrived, he spoke with Belew and Belew told him what happened. ROA.753. The Sheriff spoke with Knighton and Rob to let them know that CPS would be back later to meet with them. ROA.754. According to the Sheriff, Knighton admitted to him that she used drugs. ROA.754. The Sheriff then left, until CPS called him and told him they were ready to go to Rob and Knighton's house. ROA.754. The first time the Sheriff and CPS went there, no one answered. ROA.755. The Sheriff and CPS then went to Kathy's home to speak with Stephen, the oldest child. ROA.756.

The Sheriff and CPS then returned to Rob and Knighton's home a second time and still could not get anyone to come to the door. ROA.755. When Rob finally came to the door, Knighton began yelling at the CPS worker, Madeline Hickman.

7

ROA.757. It was at this point that the Sheriff placed Knighton under arrest.ROA.757.

According to Knighton, after Kathy left with the kids, the next thing that happened was that later that evening, Sheriff Goolsby knocked on the door and Rob let him in. ROA.621. The Sheriff then arrested her and took her to jail. ROA.621. Knighton does not remember any conversation between her and the Sheriff when this happened. ROA.621. She does not remember if she was handcuffed. ROA.623. She does not remember Kathy being around for the arrest. ROA.621.

Knighton does not know how Kathy used her power and authority as circuit clerk to unlawfully interfere with her relationship with her children ROA. 641. Knighton felt like it should not have taken her a year to get her children back but could not explain how this was related to Kathy's position as circuit clerk. ROA.641. When asked again, the best she could say was Kathy's "testimony in Youth Court and Chancery Court." ROA.641. But when pressed about what way her testimony there related to her being circuit clerk, Knighton admitted "I'm not sure." ROA.641.

According to Knighton, she does not know of "any interaction or conspiracy or any agreement that Sheriff Goolsby and Kathy Graves" had. ROA.625. She just knows that her children were initially "taken" by Kathy on February 2, 2021, without CPS involvement. ROA.626. Despite claiming she was not on drugs, she was not high, and she never had a problem with drugs, Knighton never explained why she

8

did not stop her children from going with Kathy or just go pick up the kids from Kathy's before Sheriff Goolsby came to her home. *See* ROA.607-655, *generally*.

After Knighton and Rob were arrested, CPS legally placed Stephen and Molly with Kathy. ROA.626 at pg. 84, lns. 3-16; ROA.2281-91. Both Knighton and Rob were charged with child neglect. ROA.626. According to Knighton, she was given the option of having this charge dismissed or dropped, if she went to rehab. ROA.626. But Knighton chose not to go. ROA.626. According to Kathy, CPS called her and asked her if she would take the children until this could get "sorted out" and she said "Well, of course. They're my grandchildren." ROA.718. Kathy had never reported Knighton to CPS or any other entity for drug use. ROA.721.

According to Knighton, Kathy "undertook a course of action to obtain custody of [her] children" by "going through the process of becoming a foster parent." ROA.637 And by interacting with CPS worker Jennifer Byrd at the Courthouse. ROA.637. She also believed that Kathy knew judges, attorneys, other court clerks, and police. ROA.637. But she could not explain how this impacted her case. ROA.637-638. According to Knighton, Kathy's "always been controlling, disrespectful, passive aggressive. She's just always been a hateful bitch." ROA. 640.

Knighton also could not explain how all actions taken by Belew were at the command or request of Graves. ROA.639-640. According to Belew, Kathy never directed him to go to Knighton's home and never directed him to give Knighton a

drug test. ROA.740. The best Knighton could say was that she believed Kathy testified, either in a Youth Court or Chancery Court hearing, about going to his office earlier that day. ROA.639. But she could not remember if it was Kathy that testified, or Rob, and she could not remember exactly what the testimony was. ROA.639.

According to Sheriff Goolsby, he filled out and signed the affidavit against Knighton and Rob for using drugs in the presence of their children because they both admitted to him that they were using drugs. ROA.757. And that, to him, Knighton appeared to be under the influence of something, based on the way she was acting. ROA.761. Sheriff Goolsby testified that before placing Knighton and Rob under arrest he **did not** talk to Kathy about the possibility of charging them. ROA.759. According to the Sheriff, Kathy never asked him to arrest Knighton, he never discussed arresting Knighton with Kathy, and Kathy never so much as indicated that he should arrest Knighton. ROA.761.

## B. PROCEDURAL HISTORY AND CONCESSIONS MADE BELOW

On April 21, 2022, Knighton filed suit against Kathy, Benton County, Mississippi, Sheriff of Benton County- Robert Goolsby, and Mississippi Department of Corrections Officer Steve Belew for actions she said occurred on February 2, 2021. ROA.17-19.

In her Complaint, Knighton pled the following federal law claims against Kathy: 1) violation of the Fourth or Fourteenth Amendment-Unlawful Seizure, False

10

Imprisonment, and Excessive Force; 2) Violation of the First Amendment; 3) Fabrication/ Misrepresentation of Evidence; 4) Abuse of Process/Power;  and 5) Right to Familial Association. ROA. 24-30.

Knighton pled the following state law claims against Kathy Graves: 1) assault and battery; 2) menace and intentional infliction of emotional distress; 3) malicious/ intentional interference in familial relationships; 4) malicious prosecution/ false arrest; 5) conspiracy. ROA.21-24.

After discovery ended, Kathy filed her motion for summary judgment.ROA.602-801. In it, she argued that first, that the federal law official capacity claims against her should be dismissed, as Benton County was also sued. ROA.778.  Next, she argued that the federal law claims against her in her individual capacity failed, as first, she was not acting under the color of law in her role as circuit clerk, but rather she was acting as a concerned mother and grandmother. ROA.779-781.  Second, she argued that even if she was acting under color of law, she was entitled to qualified immunity as Knighton had not proved that she committed a constitutional violation or that the violation was clearly established. ROA.781-794.

As to the state law claims, Kathy argued that Knighton's assault and battery and menace claims were barred by the one-year statute of limitations. ROA.794.  But even if not barred, Knighton had not proven these claims against Kathy. ROA.794-797.  Next, Kathy argued that Mississippi did not recognize the tort of malicious

interference with familial relationships, and that the closest tort she could find was a Virginia tort for tortious interference with familial relationships, which would have required notice under the Mississippi Tort Claims Act. ROA.797-798. Kathy also argued that Knighton failed to prove that Kathy met the elements of a malicious prosecution/false arrest claim. ROA.798-799. And that Knighton's state law conspiracy claim failed because she had no evidence of a conspiracy. ROA.799-800.

Benton County, Sheriff Goolsby, ROA. 805-1416, and MDOC Officer Steve Belew, ROA.1417-2002, all filed Motions for Summary Judgment as well.

Knighton filed one Response in opposition to all the Defendants' motions. ROA.2015-2029. In it, Knighton conceded her First Amendment and assault and battery claims. ROA.2018. Problematically for a qualified immunity (QI) analysis, Knighton did not properly analyze what each individual Defendant did, often broadly referring to "Defendants" throughout her brief. ROA.2017-2043. Moreover, Kathy's opening brief laid out the QI framework, ROA.791-794, and Knighton did not come close to satisfying her burden to defeat QI. ROA.2035-2038. Instead, Knighton generally relied on broad statements of law and cited non-authoritative and non-analogous cases. ROA.2035-2038. Additionally, Knighton failed to show that Kathy was acting under the color of law. ROA.2031-2035.

But that is not all. Knighton also abandoned many of her claims by failing to respond to Kathy's arguments. *Compare* ROA.778-800 *with* ROA.2025-2043. She

12

abandoned her official capacity claim against Kathy. ROA.2038.   As to the individual federal law claims of fabrication of evidence and abuse of process claims she also abandoned them by failing to address Kathy's arguments. *Compare* ROA.787-789 *with* ROA.2025-2043. And, as to her state law claims, Knighton abandoned her malicious interference with familial relationships and conspiracy claims by failing to address Kathy's arguments.  *Compare* ROA.797-800 *with* ROA.2025-2043.

For the remainder of the state law claims, Knighton merely repeated the elements without applying them to the facts of this case. ROA. 2041-2043. That was not enough to carry her burden at summary judgment.

Kathy filed her Reply and pointed out all these issues to the district court. ROA.2173-2196.

On June 26, 2025, the district court denied summary judgment, including on the claims conceded and abandoned by Knighton, ***never once mentioning qualified immunity***, because it found that genuine issues of material fact existed. ROA.2209-2214. In doing so, the district court found that:

> Ms. Knighton brings this action against the defendants claiming multiple violations of her Fourth and Fourteenth Amendment rights, along with various state law claims. Specifically, Ms. Knighton alleges that she was deprived of her Fourth Amendment right against unlawful seizure, excessive force, and false imprisonment when ***Officer Belew*** forcibly administered an expired drug test without reasonable suspicion or probable cause and when ***Sheriff Goolsby*** unlawfully arrested her without a warrant after falsifying an affidavit. Ms. Knighton also

13

alleges violations of her Fourteenth Amendment rights against abuse of process, fabrication of evidence, and her right to familial association. She claims that the defendants conspired together under the guise of the law to perform the acts committed against her.

The defendants, however, contend that it was in fact Ms. Knighton's husband, Robert Graves, who administered the drug test, and that Officer Belew never put his hands on Ms. Knighton. ***Officer Belew*** claims that the drug test was positive for opiates and that both Ms. Knighton and her husband admitted to using fentanyl. ***Sheriff Goolsby*** then arrived at the home and arrested Ms. Knighton. He claims that she admitted to using drugs and appeared to be under the influence of drugs. Based on these findings, ***Sheriff Goolsby*** signed an affidavit swearing under oath that Ms. Knighton used drugs in the presence of her children. She was subsequently charged with child neglect and lost custody of her children. ROA.2213 (emphasis added).

The district court then found that genuine issues of material facts existed as to all claims. ROA.2214. But the district court failed to: 1) determine whether Kathy was acting under the color of law; 2) perform a QI analysis (or even mention that this was a QI case); 3) determine whether any of these facts were material to any given claim <u>as to Kathy</u>; and 4) dismiss even the claims conceded or abandoned by Knighton. ROA. 2209-2241.

Because of all this, Kathy timely filed her Notice of Appeal on July 17, 2025. ROA.2231-2232.

## <u>SUMMARY OF THE ARGUMENT</u>

This QI appeal involves both analytical and substantive errors. Reversal is thus required on numerous grounds.

14

Analytically, the district court never even acknowledged that this was a QI case, and it never performed the analysis that precedent demands. *See Randle v. Lockwood*, 666 F. App'x 333, 336 (5th Cir. 2016) (reversing district court for failure to perform QI analysis).

Substantively, the district court also failed. At no time did the district court analyze whether Kathy was acting under the color of state law, instead of as a mother and grandmother. Second, even if she were acting as a circuit clerk, neither Knighton nor the court ever identified anything close to clearly established law.

Because Kathy's actions were those of a grandmother and not a clerk, she should not have been sued under §1983. But, even if she was, somehow, acting in her role as a public official, her actions were constitutionally permissible, and most certainly did not fall outside the bounds of QI, she should have been granted summary judgment.

For the state law claims, a number of these were barred by the Mississippi Tort Claims Act. The district court erred in not dismissing these claims.

Additionally, because the remaining state law and official capacity claims against Kathy are "inextricably intertwined" with the federal claims against her, this Court has jurisdiction to address them too. *Hawkland*, 860 Fed. Appx. at 328-329. Once this Court reviews all the claims, none should remain against Kathy.

15

# ARGUMENT

This Court reviews QI denials de novo. *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020). The district court's order is problematic, as it cannot simply refuse to perform the required QI analysis. *Buehler v. Dear*, 27 F.4th 969, 980, n.13 (5th Cir. 2022). When that is done, as it was here, either reversal or independent appellate review is required. *See Randle*, 666 F. App'x at 336.

For this reason alone, the district court's analysis cannot stand, and a reverse-and-remand would be proper. But Kathy, nonetheless, asks this Court to exercise its discretion and conduct the required QI analysis itself. This request is justified in light of the length of time this case has been pending and the importance of QI being "immunity from suit rather than a mere defense to liability[.]" *See Walton*, 82 F.4th at 320 (cleaned up). Each substantive ground supporting a reverse-and-render is addressed in turn.

## A. The Federal Law Claims Fail.

### 1. Individual Capacity Claims Fail.

Knighton's individual capacity federal law claims against Kathy fail. They fail, first, because Knighton cannot establish that Kathy was acting under the color of state law. Second, they fail because, if Kathy was, she is entitled to qualified immunity.

#### a. Kathy Was Not Acting Under Color of Law.

16

Knighton did not prove that Kathy was acting under color of law. To prevail on a § 1983 claim, Knighton must establish: (1) a violation of a right secured by the Constitution or laws of the United States, (2) that was committed by a person acting under color of state law. *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277-78 (5th Cir. 2016), *as revised* (June 16, 2016). Whether Kathy was acting under color of law is a legal issue. *Blankenship v. Buenger,* 653 Fed. Appx. 330, 335 (5th Cir. 2016).

This Court has explained: "[a] person acts under color of state law if [s]he misuses power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Under 'color' of law means under 'pretense' of law." *Bustos v. Martini Club*, 599 F.3d 458, 464 (5th Cir. 2010) (citing *Screws v. U.S.*, 325 U.S. 91, 111 (1945)). "[A]n act of an [official], not taken with authority or under cloak of authority, will not be considered under color of state law 'simply because the individual, although  pursuing private aims, happens to be a state officer.'" *Id.* at 464, n.26 (quoting *Brown v. Miller*, 631 F.2d 408, 411 (5th Cir. 1980)). This Court has further instructed:

> Whether an [official] is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation. Rather, the court must consider: (1) whether the [official] misused or abused his official power, and (2) if there is a nexus between the victim, the improper conduct, and the [official]'s performance of official duties. *Id.* at 464-65.

17

Here, the findings of the district court support the holding that Kathy was not acting under color of law. First the court found that "[t]he events that took place on February 2, 2021, spawn from a tumultuous familial relationship between mother-in-law, Kathy Graves, and now ex-daughter-in-law, Chelsea Knighton." ROA.2209. Next the court found that the entire event started when "[o]n the morning of February 2, 2021, Kathy Graves received a phone call that her son, Robert Graves, was seen passed out in his car at a local gas station in Ashland, Mississippi. As any concerned mother would do, Kathy abruptly left work and raced over to the gas station." ROA.2209. The only time Kathy's job is ever mentioned comes when the court discusses Kathy looking for help for her son, not Knighton. ROA.2210. The court found that "[a]s the Benton County Circuit Clerk for the past 18 years, Kathy knew Officer Belew dealt with frequent drug offenders as a probation officer, so she went to him for help." ROA.2210.

The remainder of the court's findings, as to Kathy's actions, also do not evidence that Kathy was acting under the color of state law. The only actions the court found that Kathy took were: 1) Kathy and Officer Belew demanded that Knighton take a drug test, 2) the Sheriff arrived at the house because Kathy called him, and 3) either Kathy or Officer Belew told Knighton that she would be arrested, and they left with Knighton's children. ROA.2211. None of these have anything to do with whether Kathy misused or abused her official power as the circuit clerk and

18

there is no nexus between Kathy's role as the circuit clerk and any of these. Indeed, any of these actions could have been taken by any mother-in-law, whether she was a public official or not.

In her role as circuit clerk, Kathy is responsible for "run[ning] elections[,]"documenting the filings for both "civil and criminal court[,]"and "marriage licenses." ROA.710; *see also e.g.* the Circuit Clerk's Handbook, Chapter 2, pgs. 19-28, 30-41 at mjc.olemiss.edu. Kathy never had any role drug testing people in Benton County during her 18-year tenure as circuit clerk. ROA.724. Nor is she responsible for making complaints to CPS or calling the Sheriff to arrest people ROA.709-721 *and* the Circuit Clerk's Handbook, Chapter 2, pgs. 19-28, 30-41 at mjc.olemiss.edu.

Indeed, instead of offering proof that Kathy was acting under the color of state law, Knighton argued that this was a jury question. ROA.2033. It is not. *Blankenship,* 653 Fed. Appx. at 335. It was a legal element of her claim that Knighton was required to prove, and she did not. Knighton's federal claims must be dismissed.

### b. Kathy Is Entitled to QI.

Even if Knighton can overcome the first step and prove that Kathy was acting under color of law, she must still overcome Kathy's entitlement to qualified

19

immunity. Knighton failed to do so below. ROA.2015-2029. And the district court committed reversable error by not conducting its own analysis. ROA.2209-2214.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' The privilege is 'an immunity from suit rather than a mere defense to liability and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Kathy is presumed to enjoy qualified immunity because abrogation of qualified immunity is the exception, not the rule. *Trevino v. Hintz*, 751 Fed. Appx. 551 (5th Cir. 2018).

When determining whether government officials are entitled to qualified immunity, courts conduct a "well-known" two-prong inquiry. *Salazar-Limon v. City of Hous.*, 826 F.3d 272, 277 (5th Cir. 2016) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001)). Knighton was required to prove a violation of a constitutional right and then show that the action causing the violation was objectively unreasonable in light of clearly established law at the time of the conduct in order to overcome the qualified immunity defense. *Blanchard-Daigle v. Geers*, 802 F. App'x 113, 119 (5th Cir. 2020) (citing *McClendon v. City of Columbia*, 305 F.3d 314, 322-23 (5th Cir. 2002) (en banc)). She did neither. ROA.2015-2029. And the district court utterly failed to engage in any qualified immunity analysis. ROA.2209-2214.

20

Reversal is required a minimum; however, this Court may perform the analysis itself and remand, and Kathy urges it to do so.

### i.     No Constitutional Violation.

### 1.  No Fourth Amendment Violation.

Knighton failed to establish a Fourth Amendment violation.[1] The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In her Complaint, Knighton pled claims of unlawful seizure, false imprisonment, and excessive force, yet she failed to prove any of these.

Personal involvement is an essential element of a civil rights cause of action under section 1983. *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).  In a cause of action under § 1983, it is necessary to specify the personal involvement of each defendant. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  There must be an affirmative link between the incident and some act by the defendant. *Rizzo v. Goode*, 423 U.S. 362, 375-77, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976). The party opposing summary judgment is required to identify specific evidence in the record

---

[1] Knighton pled both Fourth and Fourteenth Amendment claims but the correct amendment would be the Fourth not the more general provisions of the Fourteenth. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

21

and to articulate the precise manner in which that evidence supports its claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

Because Knighton failed to produce <u>any</u> evidence that Kathy played a role in any of the alleged Fourth Amendment claims, they had to fail. This point is made exceedingly clear by the district court's order which found: "Ms. Knighton alleges that she was deprived of her Fourth Amendment right against unlawful seizure, excessive force, and false imprisonment when ***Officer Belew*** forcibly administered an expired drug test without reasonable suspicion or probable cause and when ***Sheriff Goolsby*** unlawfully arrested her without a warrant after falsifying an affidavit." ROA.2213 (emphasis added). Kathy is nowhere to be found.

That is because Knighton failed to prove any set of facts which support any of these claims as to Kathy. According to Sheriff Goolsby, Kathy called him and told him about Rob being passed out at the gas station that morning. ROA. 743. "Kathy stated that she wanted [Goolsby] and CPS to come to Rob and Chelsea's home." ROA. 743. According to the Sheriff, he did not believe Kathy had been to Knighton's home at that point. ROA.753. The Sheriff's purpose in going was because Kathy "had found Rob passed out in the car." ROA.753. And Kathy had wanted CPS there so he "just assumed there was something going on with the kids as well." ROA.753. He did not recall Kathy telling him anything else that was going on. ROA.753.

22

When the Sheriff arrived, he spoke with Belew and Belew told him what happened. ROA.753. Then the Sheriff spoke with Knighton and Rob to let them know that CPS would be back later to meet with them. ROA.754. According to the Sheriff, Knighton admitted to him that she used drugs. ROA.754.

According to Sheriff Goolsby, he filled out and signed the affidavit against Knighton and Rob for using drugs in the presence of their children because they both admitted to him that they were using drugs. ROA.757. And that, to him, Knighton appeared to be under the influence of something, based on the way she was acting. ROA.761. Sheriff Goolsby testified that before placing Knighton and Rob under arrest he **did not** talk to Kathy about the possibility of charging them. ROA.759. According to the Sheriff, Kathy never asked him to arrest Knighton, he never discussed arresting Knighton with Kathy, and Kathy never so much as indicated that he should arrest Knighton. ROA.761.

Knighton does not remember Kathy being around for her arrest. ROA.621. Kathy testified that she never reported Knighton to CPS or any other entity for drug use. ROA.721.

In response to Kathy's arguments, Knighton argued that her claim for unlawful arrest against Kathy should not be dismissed because "when Defendant Graves and Belew left Chelsea's home, they told Chelsea that she was going to be arrested. Then, Defendant Goolsby shows up and arrest Chelsea without any

23

investigation and makes a false statement to get an arrest warrant for Chelsea. These statements provide sufficient evidence from which a jury can reasonably infer a conspiracy between the Defendants, even if the Defendants refuse to admit a conspiracy." ROA.2029.  The district court appeared to accept this argument when it found that "Ms. Knighton does not remember exactly but either Officer Belew or Kathy told her that she would be arrested, and they left with both children." ROA.2211.  And then denied Kathy's motion.

But both Knighton and the district court were wrong.  Neither the court nor Knighton cited any case law which has held that a circuit clerk telling someone that they were going to be arrested and then leaving them is tantamount to an arrest. ROA. 2015-2029, 2209-2214.

"A seizure is an arrest 'if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Johnson v. Thibodaux City*, 887 F.3d 726, 732-733 (5th Cir. 2018) (*Turner v. Driver*, 848 F.3d 678,692-93 (5th Cir. 2017)). No reasonable person would have understood that the circuit clerk and/or their mother-in-law telling them that someone is "coming to arrest y'all" and then immediately leaving their property was a restraint on their freedom of

movement.  The threat of future arrest, without more, does not typically create the necessary confinement.[2]

As pointed out *several* times in Kathy's opening brief, (and never explained by Knighton) there was *nothing* restraining Knighton's movement, *i.e.* preventing her from leaving her home after Kathy did.[3] If, as Knighton alleges, she was forced by Officer Belew to take a drug test and Kathy and/or Belew told her that someone would be coming to arrest her, she was free to leave her home and go to her mother's home, go retain a lawyer, or just run away. Nothing about what Kathy did constituted a restriction on Knighton's freedom, the exact opposite, as the district court found this happened when Kathy "*left* with both children." ROA.2211(emphasis added).

Next, it is impossible for Knighton to show that Kathy used "excessive force" against her. It "is axiomatic that an officer who uses no force at all has not used force that is excessive to the needs of the situation." *Carr v. City of Spring Valley Vill.*, 2022 U.S. App. LEXIS 13307, at *12 (5th Cir. May 17, 2022).  And Knighton testified that Kathy did not touch her that day. ROA.642.

---

[2] Moreover, "[ a] threat of future action, such as . . . having someone arrested, is not ordinarily enough by itself to effectuate a false imprisonment." *Tovar v. United States*, 2000 U.S. Dist. LEXIS 5044, *21 (N.D. Tex. April 18, 2000) (quoting *Morales v. Lee*, 668 S.W.2d 867, 869 (Tex. App. 1984, no writ)).

[3] ROA.778, 786, 790 ("Additionally, despite claiming she was not on drugs, she was not high, and she never had a problem with drugs, *Chelsea never explained why she did not just* stop Kathy from taking the kids or *go get them from Kathy's home*.") (emphasis added).

Knighton did not really dispute that her excessive force claim against Kathy failed. ROA.2036. According to Knighton's brief, "Defendants Belew and Graves were a part of the forced drug testing of Chelsea, wherein Chelsea was held down a forcibly given a drug test – at the order and behest of Defendant Graves." ROA.2036. But that is not what Knighton testified to or what the district court found.  Knighton testified that: "And I don't remember *if it was* Kathy or if it was Steve Belew that said, you know, you have to take a drug test, *or something about a  drug test*." ROA.614 (emphasis added). That is not Kathy *ordering* Belew to *forcibly* hold down and perform a drug test on Knighton.  The district court found that "Kathy and Officer Belew demanded that [Knighton] take a drug test, but she told them to get out of her house." ROA.2211. And that Officer Belew "escorted Ms. Knighton to the couch in the living room where he pinned her down with his knee, grabbed her face, pried open her mouth and forced an oral swab into her mouth." ROA.2211. Nothing about this proves that **Kathy** used any force on Knighton.

Finally, "[c]laims for false arrest, unreasonable seizure, and false imprisonment each require a showing of no probable cause." *Seals v. McBee*, 2019 U.S. Dist. LEXIS 98552, at *6 (E.D. La. June 12, 2019) (citing *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001)). The same is true of unlawful detention claims. *See Jones v. City of Hattiesburg*, 2021 U.S. Dist. LEXIS 121127, at *64 (S.D. Miss. June 28, 2021).  Here, the Sheriff testified that he arrested Knighton because she admitted

*to him* that she was on drugs. ROA.757.  And that, *to him*, Knighton appeared to be under the influence of something, based on the way she was acting. ROA.761. While Knighton testified that she was not on drugs, neither of these things have anything to do with Kathy.

Further still, Knighton cannot plausibly plead a Fourth Amendment violation because Kathy, and the officers, are protected by the independent-intermediary doctrine.  This doctrine "'becomes relevant when . . . a plaintiff's claims depend on a lack of probable cause.'" *Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) (quoting *Buehler*, 824 F.3d at 554). "Under the independent-intermediary doctrine, 'if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation . . . insulating the initiating party.'" *Trevino v. Iden*, 79 F.4th 524, 531 (5th Cir. 2023) (quoting *Buehler*, 824 F.3d at 553).  "This is true even if the independent intermediary's action occurred after the arrest or if the arrestee was never convicted of a crime." *Wilson*, 33 F.4th at 208 (quoting *Buehler*, 824 F.3d at 554).  Here, a warrant was issued for Knighton's arrest by the Justice Court Judge. ROA.167.

In response, Knighton alleged, without elaboration, that the independent intermediary doctrine does not apply because "the false statements presented to the judge nullify the doctrine in this case." ROA.2031.  The warrant for her arrest was issued by the Justice Court Judge on February 2, 2021. ROA.167.  Knighton failed

to explain what "false statements" were presented to the judge. It is black letter law that "[w]hen preparing a warrant affidavit, an officer may rely upon information from other officers." *Bennett v. Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989). Here, even excluding the statements that Knighton made to the Sheriff herself, the district court found that "Officer Belew informed Sheriff Goolsby that Ms. Knighton tested positive for opiates and admitted to using fentanyl. Based on this information, Sheriff Goolsby signed an affidavit swearing that Robert and Ms. Knighton had used drugs in the presence of their children and arrested Ms. Knighton." ROA.2211. Neither Knighton nor the district court demonstrated that Sheriff Goolsby *knew* these allegations to be false on February 2, 2021, when he applied for and received the warrant from the judge. The independent intermediary doctrine applies.

These claims fail.

## 2. No First Amendment Claim.

While Knighton pled a First Amendment claim, her response brief conceded it. ROA.2018. Despite this, it was not dismissed by the district court. ROA.2209-2214. It should have been.

To establish a First Amendment retaliation claim, Knighton had to prove: (1) Kathy was acting under color of state law;[4] (2) Knighton was engaged in activity protected by the First Amendment; (3) Knighton's exercise of First Amendment

---

[4] Again, Kathy was not.

rights was a substantial or motivating factor for Kathy's actions. *Rolf v. City of San Antonio, Tex.*, 77 F.3d 823, 827 (5th Cir. 1996). The First Amendment protects two broad categories of association. *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984). Only the first is relevant here. It protects "choices to enter into and maintain certain intimate human relationships." *Id.* Those intimate human relationships include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Durate*, 481 U.S. 537, 545 (1987).

According to her Complaint, "Plaintiff had refused to give custody of her children to Graves. In retaliation, Graves undertook the actions complained of herein and conspired with other officials to harm" Knighton. ROA.26. Knighton never proved how Kathy "retaliated" against her by trying to get custody of her kids. To be sure, Kathy called the Sheriff and asked him and CPS to come to the home. ROA. 743. But the only information she provided to him was about <u>Rob</u> being passed out. ROA.743, 753. According to the Sheriff, he did not even believe that Kathy had been to the house at the time she called him. ROA.753. Kathy testified that she had never reported Knighton to CPS or any other entity for drug use. ROA.721. Once the Sheriff and CPS came to Knighton's home, they conducted an independent investigation, without Kathy's involvement.

29

As for Kathy initially taking the children, Knighton testified that she does not remember Rob ever telling his mom the children could not go with her. ROA.642. And despite claiming she was not on drugs, she was not high, and she never had a problem with drugs, Knighton never explained why she did not just stop Kathy from taking the kids or go pick the kids up from Kathy's home, prior to Sheriff Goolsby coming to her home.

Knighton did not know how Kathy used her power and authority as circuit clerk to unlawfully interfere with her relationship with her children. ROA. 641. Knighton also felt like it should not have taken her a year to get her children back but could not explain how this was related to Kathy's position as circuit clerk. ROA.641. When asked directly, the best she could say was Kathy's "testimony in Youth Court and Chancery Court." ROA.641. But when pressed about what way Kathy's testimony there related to her being Circuit Clerk, Knighton admitted "I'm not sure." ROA.641. According to Knighton, Kathy's "always been controlling, disrespectful, passive aggressive. She's just always been a hateful bitch." ROA. 640. These attributes, while possibly upsetting in a mother-in-law, are not constitutional violations. This claim failed.

### 3.  No Fabrication of Evidence Claim.

This claim also failed. To succeed on a fabrication-of-evidence claim under the Fourteenth Amendment, Knighton had to show: (1) the officers fabricated

30

evidence (2) for the purpose of falsely obtaining a charge and (3) that the evidence influenced the decision to charge. *Cole v. Hunter*, 497 F. Supp. 3d 172, 190 (N.D. Tex. 2020). According to the Complaint, "Defendants provided deliberately or recklessly false/misleading evidence and/or information in order to prosecute Plaintiff including a false affidavit which constitute perjury." ROA.28.

But it is undisputed that Kathy did not submit an affidavit. ROA.167. According to Sheriff Goolsby, prior to filing the affidavit, Kathy called him and told him about Rob being passed out at the gas station that morning. ROA.743, 753. Kathy stated that she wanted Goolsby and CPS to come to Rob and Knighton's home. ROA.743, 753. The Sheriff's purpose in going was because Kathy "had found Rob passed out in the car." ROA.753. And Kathy had wanted CPS there so he "just assumed there was something going on with the kids as well." ROA.753. The Sheriff did not recall Kathy telling him anything else that was going on. ROA.753. Everything else the Sheriff learned from Belew, ROA.753, 2211, or Knighton, ROA.757, or his own observations. ROA.761. Sheriff Goolsby testified that before placing Knighton and Rob under arrest he **did not** talk to Kathy about the possibility of charging them. ROA.759. This claim fails.

Additionally, in her brief, Knighton never responded to Kathy's arguments in her section on Fabrication of Evidence. ROA.2025-2043. As to Kathy then, Knighton has abandoned this claim. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584,

31

588 n.1(5th Cir. 2006) (failure to defend a claim in response to the defendant's motion and failure to pursue the claim beyond the Complaint constituted abandonment). For this additional reason, Knighton's fabrication of evidence claims against Kathy also fails.

### 4.  No Abuse of Process Claim.

In *Morgan v. Chapman*, this Court definitively held that "there is no constitutional right to be free from abuse of process[.]"*Morgan v. Chapman*, 969 F.3d 238, 247 (5th Cir. 2020), abrogated on other grounds, *Thompson v. Clark*, 596 U.S. 36, 142 S. Ct. 1332, 212 L. Ed. 2d 382 (2022).  It was reversible error for the district court to allow this claim to proceed.

### 5.  No Familial Association Claim.

This claim fails too. "The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (cleaned up). Indeed, a parents' right to "care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Yet as strong as the "right of the family to remain together without the coercive interference of the awesome power of the state" is, the state also has a strong interest in preventing child abuse. *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne v.*

32

*Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)). So, in a substantive due process analysis, "[t]he right to family integrity must be balanced against the state's interests in protecting the health, safety, and welfare of children." *Wooley v. Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000).

A balancing test is difficult terrain for a party having to prove a clear violation of the law. *Id.* at 671; *see also Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988) (recognizing the "unsuitability of such a general right [to family integrity] to fix liability in particularized circumstances"). This Court analyzes whether a claim alleges a clearly established violation of the right to familial association by "placing [the claim], on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy." *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999). If the facts of the case "place it in the center of the continuum," meaning the state's and family's interests overlap, the right to family integrity is considered too "nebulous" to find a clearly established violation. *Id.* If, on the other hand, the case is "squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court," qualified immunity is not a defense. *Id.* Defeating immunity for a family integrity claim, thus, "hinges, in large part, upon the degree of fit between the facts of this case" and this Court's prior opinions. *Id.; see also Hodorowski*, 844 F.2d at 1217 (recognizing the

33

"unsuitability of such a general right [to family integrity] to fix liability in particularized circumstances.").

It was Knighton's burden to prove that this case "fit" between the facts of prior cases, and she failed to do so. In fact, Knighton failed to perform this analysis at all. ROA.2031, 2036.   And no prior cases involve fact patterns like this where the alleged "coercive interference of the awesome power of the state" is actually the children's grandmother. That is because the right of the family to "remain together" may extend beyond the "nuclear family" to other relatives, such as "aunts, uncles, cousins, and grandparents." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 921 (5th Cir. 2000) (citing *Moore v. City of E. Cleveland*, 431 U.S. 494, 505 (1977)).

Here, as Knighton testified, her children were initially "taken" by Kathy on February 2, 2021, without CPS involvement, i.e. *without involving the state*. ROA.642. Knighton also testified that she does not remember Rob ever telling *his mom* the children *could not* go with her. ROA.642. And, again, despite claiming she was not on drugs, she was not high, and she never had a problem with drugs, Knighton never explained why she did not just stop Kathy from taking the kids or go get them from Kathy's home after they left. *See* ROA.605-55, *generally; see also* ROA.2017-44, *generally*. Next, as Knighton admits, after she and Rob were arrested, the children were *legally* placed with Kathy by CPS.  ROA.626 at pg. 84, lns. 3-16; ROA.2281-91.  Yet Knighton has not sued CPS, *only Kathy*.

When CPS was called out, they came to Kathy's home and spoke with Stephen. ROA.756 at pg. 32, lns. 14-18; ROA.2291. According to the CPS documents, Stephen told the CPS worker that the morning of February 2, 2021, "he tried to wake his parents up but they wouldn't wake up." ROA.2291. Stephen said that "his mother was on the floor and his father was a sleep (sic) on the wall." ROA.2291.

The CPS worker then interviewed Knighton herself on February 2, 2021. ROA.2290. According to Ms. Hickman, Knighton "stated that she had only taken suboxone yesterday." ROA.2290. But "Chelsea [Knighton] appeared to be under the influence at the time of [the] interview." ROA.2290. Additionally, on February 5, 2021, Ms. Hickman documented a call from Knighton wherein Knighton "stated that she wanted to go to Fairland for rehab." ROA.2290. And "stated that she was using Fentanyl, Opiates, and Adderall." ROA.2290. Knighton may say that all of these statements are lies, but none of them came from <u>Kathy</u>. Her claim failed.

### ii.    The Rights Were Not Clearly Established.

Even if Knighton had proved a constitutional violation as to any of her constitutional claims (which she did not), Kathy was entitled to dismissal on clearly established grounds. Knighton failed to provide the district court with any clearly established law. And the district court completely and utterly failed to do a clearly established analysis.

For purposes of clarity, Kathy first addressed the constitutional standards applicable to each claim. *See, e.g.*, *Johnson v. Hollins*, 716 F. App'x 248, 253 n.8 (5th Cir. 2017) ("We need not reach the qualified immunity question because we do not find a constitutional violation."). But this Court may skip straight to QI if it desires. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *but see Buehler*, 27 F.4th at 982 ("[A]lthough we now may also 'leapfrog' the first prong and resolve cases solely on the basis that defendants' conduct—even if unlawful—did not violate clearly established law, we think it better to address both steps in order to provide clarity and guidance for officers and courts." (quotations and cited case omitted)). Kathy will set forth the qualified-immunity framework and then explain its application to this case.

*Framework.* Determining whether a plaintiff has satisfied his or her qualified-immunity burden involves two steps: (1) a nomination phase and (2) a qualification phase. *See Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) ("When an official raises qualified immunity on summary judgment, as [Kathy] did here, the plaintiff bears the burden of showing that the defense does not apply."); *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (reversing the Tenth Circuit because the plaintiff "failed to identify a case where an officer acting under similar circumstances [ ] was held to have violated the Fourth Amendment"); *Vann v. Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (granting QI because the plaintiff "cited nary a pre-existing or

36

precedential case"); *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (explaining that the identified case must be both "authoritative" and "specific"). These steps apply in all except an "obvious" case. *Wesby*, 583 U.S. at 64. "The standard for obviousness is sky high, and this case does not meet it." *See Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020). Ultimately, QI "'represents the norm, and courts should deny a defendant immunity only in rare circumstances.'" *See Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoted case omitted); *Morrow v. Meachum*, 917 F.3d 870, 874-76 (5th Cir. 2019) (explaining that "[t]he qualified-immunity doctrine makes" obtaining "money damages from the personal pocket of a law enforcement officer" "difficult in every case[,]" QI presents a "heavy burden" for plaintiffs, and the denial of QI is an "extraordinary remedy").

Nomination Phase.    *Vann v. Southaven*, 884 F.3d 307, illustrates the nomination phase. There, a Panel reversed a grant of QI on a Fourth Amendment claim due to perceived factual disputes. *Id*. But after re-hearing, the opinion was vacated. *Id*. at 310. Unlike the original opinion, the new opinion recognized that "[i]t is the plaintiff's burden to find a case in his favor[.]" *Id*. The plaintiff had "cited nary a pre-existing or precedential case . . . showing specific law on point[,]" so QI was reinstated. *Id*.

Following *Vann*, countless decisions from this Court have highlighted the plaintiff's obligation of pointing to a specific case.[5] These decisions are consistent with the rule in other Circuits.[6] Most importantly, though, the plaintiff's nomination obligation is what Supreme Court precedent demands. *See White*, 580 U.S. at 79 (granting QI due to "fail[ure] to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment").

Qualification Phase. The next step, once a particular case has been identified, is to determine if the nominated case qualifies as "clearly established law." This qualification determination involves inquiry into whether the identified case is both "authoritative" and "specific." *See Wesby*, 583 U.S. at 63-64. The Supreme Court reversed the D.C. Circuit in *Wesby* for "not follow[ing]" the sub-steps. *Id*. at 65.

Authoritative Requirement. Any nominated case must be "authoritative" precedent. Unfortunately, however, the Supreme Court has never said what precedents, other than its own, count as "authoritative." In two different cases, it

---

[5]*E.g.*, *Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) (explaining that "a party must 'identify a case where an officer acting under similar circumstances . . . was held to have violated the" Constitution) (emphasis in original; quoted Supreme Court case omitted); *Rich*, 920 F.3d at 297 ("Rich has failed to identify precedent clearly establishing that the officers' conduct violated Dupuis-Mays's constitutional rights"); *Morrow*, 917 F.3d at 876 (holding that the appellants "have not identified a controlling precedent"); *Bustillos v. El Paso Cty. Hosp. Distr.*, 891 F.3d 214, 222 (5th Cir. 2018) ("Appellant has not carried her burden of pointing this panel to any case that shows, in light of the specific context of this case, that the Doctors' or Nurses' conduct violated clearly established law.").

[6]*E.g.*, *Farrell v. Montoya*, 878 F.3d 933, 937 (10th Cir. 2017) ("In this circuit, to show that a right is clearly established, <u>the plaintiff must point</u> to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (emphasis added; quoted case omitted).

was acknowledged that the question is unresolved in Supreme Court jurisprudence. *Id*. at 591 n.8 (explaining that "[w]e have not yet decided what precedents – other than our own – qualify as controlling authority for purposes of qualified immunity[,]" and "[w]e express no view on that question here"); *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (same).

By contrast, this Court has addressed the question. In the en banc decision of *Morgan v. Swanson*, three authoritative sources were identified: (1) Supreme Court decisions, (2) Fifth Circuit decisions, or (3) "a robust consensus of persuasive authority[,]" i.e. decisions not from the Supreme Court or this Court. 659 F.3d 359, 371-72 (5th Cir. 2011). Although courts, including this one and the Supreme Court, have recently questioned whether (2) or (3) could clearly establish the law.[7]

Specificity Requirement. Even if "authoritative," a nominated case does not count as clearly established law unless it satisfies the "specificity" requirement. The starting point under this prong is an evaluation of the alleged constitutional violation in terms of the "particular conduct" at issue. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

---

[7] *See Rivas-Villegas v. Cortesluna,* 595 U.S. 1, 2 (2021) ("Even assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983, LaLonde did not give fair notice to Rivas-Villegas. He is thus entitled to qualified immunity."); *San Francisco v. Sheehan*, 135 S. Ct. 1765, 1778 (2015) (stating that, "**to the extent** that a 'robust consensus of cases of persuasive authority' could itself clearly establish" law) (emphasis added); *see also Taylor v. Barkes*, 575 U.S. 822, 826 (2015) (using same "to the extent" language); *Nerio*, 974 F.3d at 576 n.2 ("Although we know the Supreme Court's decisions can clearly establish the law, the Supreme Court has never held that our decisions can do the same.").

Importantly, plaintiffs must not only identify the analogous case but must also "explain the analogy." *Joseph*, 981 F.3d at 346.

Once the factual context is identified, the question becomes whether the authoritative precedent places the conduct "beyond debate." *See White*, 580 U.S. at 79. "The 'beyond debate' standard is a high one[,]"[8] which is not met just because cases have factual similarities. *See, e.g.*, *Perry v. Durborow*, 892 F.3d 1116, 1126 (10th Cir. 2018) (granting QI despite "factual similarities" with a prior precedent). Unless <u>every</u> single reasonable officer on the street would know "in the blink of an eye" that his or her conduct is unconstitutional because of the authoritative precedent, then QI must be granted. *See Morrow*, 917 F.3d at 876; *Morgan*, 659 F.3d at 371 (quoting Supreme Court precedent). This principle reflects a "manifestation of the law's general concern about retroactive punishment or liability." *Wesby*, 816 F.3d at 110 (Kavanaugh, J., dissenting) (citing Supreme Court precedent).

*Application of the QI Framework*. A fundamental error in this case is that the district court did not conduct a QI analysis ***at all***, much less one for each individual defendant as the law demands. *Norris v. Williams*, 776 F. App'x 619, 622 (11th Cir.

---

[8] *See Hughes v. Kisela*, 862 F.3d 775, 793 (9th Cir. 2016) (Ikuta, J., dissenting). Of course, Judge Ikuta's dissent was vindicated when the Supreme Court subsequently summarily reversed in *Hughes*. This Court similarly acknowledged that the "beyond debate" standard presents a "heavy burden." *See Morrow*, 917 F.3d at 874.

2019) (explaining that "courts are required to perform an independent qualified immunity analysis for each defendant"). In fact, the summary judgment order *never even mentions qualified immunity* much less attempts to apply the requirements. This Court has made clear that such an omission cannot stand because it "violate[s] the tenet that qualified immunity questions should be resolved at the earliest possible stage in the litigation." *See Randle*, 666 F. App'x at 336 (cleaned up) (reversing district court's failure to conduct a QI analysis).

When the district court failed to perform a qualified-immunity analysis in *Randle*, this Court remanded with instructions. 666 F. App'x at 337 ("For the foregoing reasons, we REVERSE the district court's order to the extent it failed to address qualified immunity and REMAND to the district court for reconsideration of whether each defendant is entitled to qualified immunity."); *see also McDonald v. McCelland*, 779 F. App'x 222, 225 (5th Cir. 2019) ("In these circumstances— where . . . the district court failed to address half of the qualified-immunity inquiry— we exercise our discretion to send the excessive-force question back for further consideration.").

But a different path should be taken here. As has been done in other cases, this Court should exercise its discretion to decide the immunity issue in the face of the district court's implicit denial. *Liberty Mutual Ins. Co. v. Louisiana Dept. of Ins.*, 62 F.3d 115, 117-18 (5th Cir. 1995); *see also Burnikel v. Fong*, 886 F.3d 706,

41

710 n.3 (8th Cir. 2018) ("To the extent the district court failed to conduct an individualized qualified immunity analysis for each officer, we do so here."); *Lopez v. Shiroma*, 668 F. App'x 804, 806 (9th Cir. 2016) (explaining that, because "qualified immunity is a question of law[,] it is [ ] within our discretion to take up in the first instance"). Such discretion is especially justified, since "[w]hether an asserted federal right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'" *Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (quoted case omitted); *see also Lopez*, 668 F. App'x at 806.

A major problem for Knighton in this case is that neither counsel nor the district court has ever pointed to a factually-similar case, from an authoritative jurisdiction, that could be said to have "clearly established" any of Kathy's conduct as unconstitutional. In the response to summary judgment, Knighton pointed only to general propositions of law and factually different cases that in no way placed Kathy's conduct "beyond debate." ROA.2025-2043.

Applying the QI standards to this case, there is no governing authority holding that Kathy acted objectively unreasonable under clearly established law. In sum, this Court has reiterated that "[t]he qualified-immunity doctrine makes" obtaining "money damages from the personal pocket of a law enforcement officer" "difficult in every case." *See Morrow*, 917 F.3d at 874. In that same opinion, it was explained that QI presented a "heavy burden" for plaintiffs and that the denial of QI is an

42

"extraordinary remedy." *Id*. at 874-76. Since Knighton did not demonstrate that Kathy acted objectively unreasonably under clearly established law, the district court erred in denying QI.

### 2. Official Capacity Claims Fail.

As Benton County was a named party, the district court should have dismissed the official capacity claims. *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020).

## B. STATE LAW CLAIMS FAIL

Knighton's state law claims failed, and the district court erred by not dismissing them. Most of her claims are covered by the MTCA which makes them immediately reviewable by this Court. *Lampton v. Diaz*, 661 F.3d 897, 899 (5th Cir. 2011) (per curiam) ("The denial of immunity under Mississippi law, like a denial under federal law, is appealable under the collateral order doctrine."). The others are "inextricably intertwined" with the individual federal claims against her, therefore, this Court has jurisdiction to address them too. *Hawkland*, 860 Fed. Appx. at 328-329.

### 1. Knighton Conceded Her Assault & Battery Claim.

Knighton conceded her assault and battery claim. ROA.2018. Despite this, the district court still did not dismiss it. This claim was barred by the one-year SOL as it is an intentional tort. Miss. Code Ann. §15-1-35. Knighton's claims allegedly

arose on February 2, 2021, ROA.19, and she did not file her Complaint until April 14, 2022. ROA17. It is barred.

## 2. Menace/ Intentional Infliction of Emotional Distress Claim Failed.

The tort of menace is tantamount to intentional infliction of emotional distress. *Jones v. City of Hattiesburg*, 228 So. 3d 816, 819, fn. 5 (Miss. Ct. App. 2017) (citing *Guthrie v. J.C. Penny Co.*, 803 F.2d 202, 210-11 (5th Cir. 1986)). Given that Knighton never filed a MTCA notice of claim, her menace/IIED claim is barred. *Moton v. City of Clarksdale*, 2023 Miss. LEXIS 91, *6 (Miss. April 6, 2023) (barring Plaintiff's IIED claim against governmental entity for failure to provide notice under the MTCA). Even if this Court were to hold that it is not, the only way these claims could proceed is if they were based on malice. *Jones*, 228 So. 3d at 819 (Miss. Ct. App. 2017).

A claim for intentional infliction of emotional distress requires that (1) the defendant acted willfully or wantonly toward the plaintiff by committing certain described actions; (2) the defendant's acts are ones that evoke outrage or revulsion in civilized society; (3) the acts were directed at, or intended to cause harm to, the plaintiff; (4) the plaintiff suffered severe emotional distress as a direct result of the acts of the defendant; and (5) such resulting emotional distress was foreseeable from the intentional acts of the defendant. *Rainer v. Wal-Mart Assocs. Inc.*, 119 So. 3d

44

398, 403-04 (¶19) (Miss. Ct. App. 2013) (citing *J.R. ex rel. R.R. v. Malley*, 62 So. 3d 902, 906-07 (¶15) (Miss. 2011)). The standard for an intentional-infliction- of-emotional-distress claim is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent, or reckless. *Little v. Collier*, 759 So. 2d 454, 457 (¶13) (Miss. Ct. App. 2000) (citing *Morrison v. Means*, 680 So. 2d 803, 806 (Miss. 1996)). The Mississippi Supreme Court has held that "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Speed v. Scott*, 787 So. 2d 626, 630 (¶ 19) (Miss. 2001) (quoting *Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993)).

Knighton failed to show that Kathy acted with malice, her actions are ones that evoke outrage, her actions were intended to harm Knighton, and that Knighton's emotional distress was foreseeable. *Compare with Smith v. Malouf*, 722 So. 2d 490 (Miss. 1998). Again, the Sheriff testified that when Kathy called him, she requested that the Sheriff and CPS come to the house because *Rob* had been passed out at the gas station and she was concerned about the kids. *She never mentioned Knighton.* The Sheriff and CPS then conducted their own investigation. It was their independent investigation that led to Knighton's arrest and the children being taken, not any allegedly false allegations Kathy made against Knighton. It cannot be the

45

case that a public servant cannot call other government officials out of concern for her own grandchildren. That does not (and cannot) "shock the conscience."

### 3. Malicious Interference with Familia Relationships Claim Failed.

Kathy argued in her summary judgment brief that it was unclear if Mississippi even recognized this claim, as there was no Mississippi case law adopting it. And the seminal case on it appeared to be a Virginia Supreme Court case, *Wyatt v. McDermott*, 283 Va. 685 (Va. 2012), which had never been cited by a Mississippi Court. Knighton never responded to Kathy's argument. ROA. 2025-2043. Therefore, she abandoned this claim. *Black,* 461 F.3d at 588 n.1. The district court erred in not dismissing it.

### 4. Malicious Prosecution/ False Arrest Claims Failed.

These claims also failed and the district court erred in not dismissing them. The elements of the tort of malicious prosecution are: (1) The institution of a proceeding; (2) by, or at the insistence of the defendant; (3) the termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceedings; (6) the suffering of injury or damage as a result of the prosecution. *McClinton v. Delta Pride Catfish, Inc.*, 792 So. 2d 968, 973 (Miss. 2001).

Malice in the law of malicious prosecution does not refer to mean or evil intent but rather connotes a prosecution instituted primarily for a purpose other than that of bringing an offender to justice. *Strong v. Nicholson*, 580 So. 2d 1288, 1293 (Miss. 1991). In *Nassar v. Concordia Rod and Gun Club, Inc.*, the court said that in order to determine malice the court must look to the defendant's state of mind, not his attitude. 682 So. 2d 1035 (Miss. 1996). The Mississippi Supreme Court has said that malicious prosecution suits are not favored but must be "managed with great caution." *State ex rel. Foster v. Turner*, 319 So. 2d 233, 235 (Miss. 1975).

"Their tendency is to discourage prosecution of crime as they expose the prosecutor to civil suits, and the love of justice may not always be strong enough to induce individuals to commence prosecution when if they fail, they may be subjected to the expenses of litigation even though they are found not liable for damages." *Id.*

In her response, Knighton merely laid out the elements of this tort and then made the conclusory statement that "Defendant Belew and Graves started the prosecution when they influenced the sheriff's decision to charge and arrest Chelsea." ROA.2042. But, as Knighton admitted, in *Nassar v. Concordia Rod and Gun Club, Inc.*, the Mississippi Supreme Court held that in order to determine malice the court must look to the defendant's state of mind, not his attitude. ROA.2042. There is no evidence *whatsoever* that Kathy's state of mind was malicious. ROA.2039-2040. In fact, all the evidence was to the contrary.  The only evidence of

47

Kathy's state of mind was her testimony was that she was worried about Rob and her grandchildren. *Compare* ROA.613 *with* ROA.713.    This claim must be dismissed.

### 5.  Conspiracy Claim Fails.

This claim should have been dismissed. Conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Knighton admitted that she had no evidence of a conspiracy between Kathy and the Sheriff. ROA.625.  Knighton also could not explain how all actions taken by Belew were at the command or request of Kathy. ROA.639-640. According to Belew's testimony, Kathy never directed him to go to Knighton's home and never directed him to give Knighton a drug test. ROA.740.

Moreover, in her response, Knighton once again failed to address Kathy's arguments, thereby abandoning this claim. *Black*, 461 F.3d at 588 n.1. The district court erred in not dismissing it.

## <u>CONCLUSION</u>

At a bare minimum, reversal is required in this case because of the district court's failure to conduct a qualified immunity analysis.  Because, however, this is an issue of law, Kathy would request that this Court address all issues before it and reverse and render in her favor.

48

RESPECTFULLY SUBMITTED, this the 14th day of October, 2025.

Kathy Graves, Defendant-Appellant

By:   */s/Katherine P. McClellan*
Jacks Griffith Luciano, P.A.
150 N. Sharpe Avenue
P.O. Box 1209
Cleveland, MS 38732

## **CERTIFICATE OF SERVICE**

The undersigned certified that on this, the 14th day of October, 2025, the foregoing document was filed with the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

*/s/Katherine P. McClellan*

# **CERTIFICATE OF COMPLIANCE**

1.　This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 12,460 words.

2.　This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman, 14-point font, except for the footnotes, which are proportionally-spaced typeface using Microsoft Word in Times New Roman, 12-point font.

*/s/Katherine P. McClellan*

51