Case No. 25-60383

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**BENTON COUNTY, MISSISSIPPI, ET AL.**

Defendant – Appellant

V.

**CHELSEA JADE KNIGHTON,**

Plaintiff – Appellee

On Appeal from the United States District Court
for the Northern District of Mississippi, Oxford Division
CIVIL ACTION NO. 3:22-cv-00056-MPM

## BRIEF OF APPELLANT,
## BENTON COUNTY, MISSISSIPPI AND SHERIFF GOOLSBY

Honorable Michael P. Mills, United States District Court Judge

**WESLEY C. PINSON (MSB#106508)**
**ROBERT J. DAMBRINO III MSB # 5783**
Gore, Kilpatrick & Dambrino, PLLC
Post Office Box 901
Grenada, Mississippi 38902-0901

**Attorneys for Appellant**
Benton County, Mississippi and Sheriff
Goolsby

## CERTIFICATE OF INTERESTED PERSONS

The undersigned attorney of record for Appellant, Benton County, Mississippi and Sheriff Goolsby certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Chelsea Knighton | Daniel Waide of Johnson, Ratliff & Waide Hattiesburg, MS |

| Appellants: | Counsel for Appellants: |
|---|---|
| Steve Belew | Wilson Minor of Office of the Attorney General Jackson, MS, appellate counsel |
| Steve Belew | James Hall of Office of the Attorney General Jackson, MS, trial counsel |
| Benton County, Mississippi | Robert Dambrino of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Benton County, Mississippi | Wesley Pinson of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Robert Goolsby | Robert Dambrino of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Robert Goolsby | Wesley Pinson of Gore, Kilpatrick & Dambrino, P.L.L.C. Grenada, MS, trial and appellate counsel |
| Kathy Graves | Daniel Griffith of Jacks Griffith Luciano, P.A. Cleveland, MS, trial and appellate counsel |

1

| Kathy Graves | Katherine McCellan of Jacks Griffith Luciano, P.A. Cleveland, MS, trial and appellate counsel |

| Other Interested Parties: | |
| --- | --- |
| District Court Judge Michael P. Mills | |
| Magistrate Judge Roy Percy | |
| | |

Respectfully submitted, THIS the 13th day of November, 2025.

By: */s/Wesley C. Pinson*
   Wesley C. Pinson (MSB#106508)
   Robert J. Dambrino, III, MSB # 5783
   Attorney for Appellee

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This is an appeal from a denial of qualified immunity where the district court never once mentioned qualified immunity, considered all the defendants as one, and never performed a clearly established analysis. Under the Court's precedent, at a minimum, reversal is required. Still, Sheriff Goolsby and Benton County welcome the opportunity to orally discuss the district court's analytical and substantive errors in denying qualified immunity.

## TABLE OF CONTENTS

Certificate of Interested Persons……………………………………………...i

Statement Regarding Oral Argument…………………………………………...iii

Table of Contents…………………………………………………………..iv

Table of Authorities…………………………………………………...v

Jurisdictional Statement……………………………………………………1

Statement of Issues Presented for Review……………...………….…….....2

Statement of the Case……………………………………...………………..3

Summary of the Argument…………………………………...………………......24

Argument…………………………………………………………………27

    1.   The court erred in disregarding the chancery court transcript…………28
    2.   Sheriff Goolsby is entitled to Qualified Immunity…………………...35
    3.   The District Court failed to conduct a qualified immunity analysis……46
    4.   The District Court allowed the abandoned First Amendment Retaliation claims to proceed………………………………………………49
    5.   The District Court allowed the abandoned Excessive Use of Force Claims………………………………………………………..49
    6.   Vicarious Liability is not applicable to §1983 claims…………………49
    7.   Knighton's State Law claims should have been dismissed……………52

Conclusion…………………………………………...…………...…......56

Certificate of Compliance…………………………….……………………..58

Certificate of Service……………………………………………………..59

# TABLE OF AUTHORITIES

**Cases:**                                                                        **Page**

*Albright v. Oliver*
510 U.S. 266, 274 (1994)                                                             39

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 247-248, 256 (1986)                                                27, 34

*Ashcroft v. al-Kidd*
563 U.S. 731, 741 (2011)                                                            46

*Barnhill v. Hildreth-White*
No. 21-50646, 2022 U.S. App. LEXIS 24143, (5th Cir. 2022)                          50

*Beck v. Ohio*
379 U.S. 89 (1964)                                                                  37

*Bell v. Wolfish*
441 U.S. 520, 535 n.16 (1979)                                                       49

*Bennett v. Grand Prairie*
883 F.2d 400, 407 (5th Cir. 1989)                                                   44

*Black v. N. Panola Sch. Dist.*
461 F.3d 584, 588 n.1 (5th Cir. 2006)                                               56

*Blackwell v. Barton*
34 F.3d 298, 302 (5th Cir. 1994)                                                    39

*Buehler v. City of Austin/Austin Police Dep't*
824 F.3d 548, 553-554 (5th Cir. 2016)                                            34, 44

*Burnikel v. Fong* 886 F.3d 706, 710 n.3 (8th Cir. 2018)                            47

*Campbell v. City of San Antonio*
43 F.3d 973, 976 (5th Cir. 1995)                                                    40

*Cass v. City of Abilene*
814 F.3d 721, 728 (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . 27

*Craig v. Dallas Area Rapid Transit Authority*
504 F. App'x 328, 331-32 (5th Cir. 2012) . . . . . . . . . . . . 34

*Cuadra v. Hous. Indep. Sch. Dist.*
626 F.3d 808, 814 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . 39

*Forsyth v. Barr*
19 F.3d 1527, 1533 (5th Cir. 1994) . . . . . . . . . . . . . . . . . 28

*Green v. Thomas*
129 F.4th 877, 889 (5th Cir. 2023) . . . . . . . . . . . . . . . . . 34

*Guthrie v. J.C. Penny Co.*
803 F.2d 202, 210-11 (5th Cir. 1986) . . . . . . . . . . . . . . . 53

*Harlow v. Fitzgerald*
457 U.S. 800, 818 (1982) . . . . . . . . . . . . . . . . . 25, 35, 36

*Hawkland v. Hall* 860
Fed. Appx. 326, 328-329 (5th Cir. 2021) . . . . . . . . . . . . . 1

*Jenkins v. City of Grenada*
813 F. Supp. 443, 446 (N.D. Miss. 1993) . . . . . . . . . . . . 54

*Jolly v. Klein*
923 F. Supp. 931, 943 (S.D. Tex. 1996) . . . . . . . . . . . . . 50

*Jones v. City of Hattiesburg*
228 So. 3d 816, 819 fn. 5 (Miss. Ct. App. 2017) . . . . . . . 53

*Joseph ex rel. Estate of Joseph v. Bartlett*
981 F.3d 319, 328 (5th Cir. 2020) . . . . . . . . . . . . . . . . . 35

*Kovacic v. Villarreal*
628 F.3d 209, 214 (5th Cir. 2010) . . . . . . . . . . . . . . . . . 30

*Lampton v. Diaz*

661 F.3d 897, 899 (5th Cir. 2011)     52

*Liberty Mutual Ins. Co. v. Louisiana Dept. of Ins.*
62 F.3d 115, 117-18 (5th Cir. 1995)     47

*Little v. Collier*
759 So. 2d 454, 457 (Miss. Ct. App. 2000)     53

*Maryland v. Pringle*
540 U.S. 366, 371 (2003)     45

*McClinton v. Delta Pride Catfish, Inc.*
792 So. 2d 968, 973 (Miss. 2001)     55

*Mendenhall v. Riser*
213 F.3d 226, 230 (5th Cir. 2000)     37

*Morin v. Caire*
77 F.3d 116, 121 (5th Cir. 1996)     41

*Morrison v. Means*
 680 So. 2d 803, 806 (Miss. 1996)     53

*Murphy v. Kellar*
950 F.2d 290, 292 (5th Cir. 1992)     50

*Myers v. Klevenhagen*
97 F.3d 91, 94 (5th Cir. 1996) .     51

*Norris v. Williams*
776 F. App'x 619, 622 (11th Cir. 2019)     46

*Oliver v. Scott*
276 F.3d 736, 742 (5th Cir. 2002)     49

*Orr v. Copeland*
844 F.3d 484, 490-491 (5th Cir. 2016)     24, 27, 29, 33

*Pearson v. Callahan*
555 U.S. 223, 231-232 (2009)     25, 35, 36, 45

*Peñalbert-Rosa v. Fortuño-Burset*
631 F.3d 592, 595 (1st Cir. 2011)                                    41

*Roque v. Harvel*
993 F.3d 325, 331 n.5 (5th Cir. 2021)                               35

*Scott v. Harris*
550 U.S. 372, 380 (2007)                                      25, 27, 37

*Shaw v. Burchfield*
481 So. 2d 247, 255 (Miss. 1985)                                   56

*Smith v. Malouf*
722 So. 2d 490 (Miss. 1998)                                        54

*Thompkins v. Belt*
828 F.2d 298, 304 (5th Cir. 1987                                    49

*United States v. Jones,*
239 F.3d 716, 718-19 (5th Cir. 2001)                               38

*Walton v. City of Verona*
82 F.4th 314, 320 (5th Cir. 2023)                                   1

*Wigginton v. Jones*
964 F.3d 329, 335 (5th Cir. 2020)                                  48

*Williams v. City of Jackson*
2022 U.S. Dist. LEXIS 178486, (S.D. Miss. 2022)                   51

*Wilson v. Stroman*
33 F.4th 202, 208 (5th Cir. 2022)                                  44

*Wood v. Bexar Cty*.
147 F.4th 534 (5th Cir. 2023)                                      28

*Wyatt v. McDermott*
283 Va. 685 (2012)                                                 55

**Federal Statutes**

42 U.S.C. § 12101 et seq…………………………………………………………3

18 U.S.C. § 2510.…………………………………………………………21-23

18 U.S.C. § 2511.…………………………………………………….………21-23

18 U.S.C. § 2515. …………………………………………….……..21-23

28 U.S.C. § 1331 ...................................................................................... 6

28 U.S.C. § 1367 ...................................................................................... 6

42 U.S.C. § 1983 ...................................................................................... 6

**State Statutes**

Mississippi Code Annotated Section 15-1-35 .................................................. 49

Mississippi Code Annotated Section 25-1-109 ................................................ 51, 54

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Knighton's Complaint was based on federal causes of action under 42 U.S.C. § 1983 and 28 U.S.C. §1367 (a) for state law claims which were related to the same. ROA.17-32. This Court has interlocutory-appellate jurisdiction over the district court's immunity denials. *Walton v. City of Verona*, 82 F.4th 314, 320 (5th Cir. 2023). This Court may review denials of immunity under Mississippi law because it is a protection from suit. Id. The Court has pendant appellate jurisdiction over the remaining issues when an appealable order is "inextricably intertwined" with an unappealable order. Hawkland v. Hall, 860 Fed. Appx. 326, 328-329 (5th Cir. 2021)

## STATEMENT OF ISSUES ON APPEAL

1. The District Court erroneously disregarded the chancery court transcript and the uncontradicted testimony of Kayla Reno presented therein, thereby improperly denying summary judgment by failing to recognize the absence of genuine issues of material fact.

2. The District Court erroneously denied qualified immunity to Sheriff Robert Goolsby, as there was probable cause for the arrest and no clearly established constitutional violation.

3. The District Court erroneously failed to dismiss the abandoned First Amendment Retaliation claims.

4. The District Court erroneously failed to dismiss the abandoned Eighth Amendment Excessive Use of Force claims.

5. The District Court erroneously denied summary judgment to Benton County, Mississippi, as there was no evidence of a municipal policy or custom causing any alleged constitutional violation.

6. Knighton's State Law claims should have been dismissed.

## STATEMENT OF THE CASE

### A. Statement of Facts

This is a civil rights lawsuit filed by Chelsea Knighton ("Knighton"), the ex-daughter-in-law of the Benton County Circuit Clerk and defendant herein, Kathy Graves ("Kathy"). As the district court found "[t]he events that took place on February 2, 2021, spawn from a tumultuous familial relationship between mother-in-law, Kathy Graves, and now ex-daughter-in-law, Chelsea Knighton." ROA.2209. Knighton and Robert Graves ("Rob"), Kathy's son, were married from June 20, 2014 until their divorce in July of 2021. ROA.190, 928. Meaning for seven (7) years, Kathy was Knighton's mother-in-law. ROA.19,928. Together Rob and Knighton have three children. ROA.907. At the time of this incident on February 2, 2021, however, only two had been born: Stephen, who was six, and Molly, who was two. *Id*. The Complaint alleges that Kathy undertook a course of action designed to wrest custody of Knighton's children (Kathy's grandchildren) from Knighton. ROA.19.

In addition to being Knighton's mother-in-law, Kathy also happens to be the long-time circuit clerk of Benton County, Mississippi. ROA.1286. In her role as circuit clerk, Kathy is responsible for "run[ning] elections[,]" documenting the filings for both "civil and criminal court[,]" and "marriage licenses." ROA.1288. Kathy has never had any role drug testing during her 18-year tenure as circuit clerk. ROA. 1292.

Unfortunately, Rob has had a long running problem with drugs. *Id*. Kathy has attempted to get Rob help through the years, including having him committed to the state hospital. ROA.1293. Rob would get better for a little while, then he would fall off the wagon. *Id*. Rob's drug use has been a consistent problem throughout Knighton and Rob's marriage. ROA.1019.

In this regard, however, the record would show that Knighton has also had issues with drug abuse and/or addiction. ROA.928. In 2015, she checked herself into a rehab program for her addiction to pain pills. ROA.929. Knighton also admitted that she has snorted Adderall and used cocaine. ROA.1048. Similarly, in December 2018, "Corinth Police Department was notified by Wal-Mart employees as well as concerned citizens regarding [Rob and Knighton] who appeared to be under the influence and had [Stephen] with them. See Brief of Appellant Kathy Graves quoting ROA.2263-72. One of the witnesses stated that the mother was seen in the restroom snorting crushed pills." ROA.2264. When CPS arrived at Wal-Mart, like the instant case, both Rob and Knighton "were under the influence and **admitted** to snorting pills." ROA.2264. As a result, they were "too intoxicated to make a safety plan." ROA.2264. This led to Stephen being placed "in emergency custody… due to child neglect." ROA.2264. Both Rob and Knighton pled guilty to child neglect in Youth Court and Stephen was placed with Kathy. ROA.941, 2273. Eventually, Stephen was

returned to his parents' custody almost a year later, on September 24, 2019. ROA.2292.

In August of 2020, CPS received a report regarding Rob and Knighton and both tested positive for marijuana—while both Stephen and Molly were in their custody and Knighton was breastfeeding. ROA.2274-80. Shortly thereafter, in January of 2021—just a month before this incident—Rob took a picture of Knighton, apparently passed out, with a plate of what appears to be lines of some type of narcotic in her hand. ROA.725-728.

On the day of the incident in question, February 2, 2021, Knighton, Rob, Stephen, and Molly lived together in Ashland, Mississippi in Benton County. ROA.930. "[T]hat morning, Kathy Graves received a phone call that her son, Robert Graves, was seen passed out in his car at a local gas station in Ashland, Mississippi." ROA.2209. According to Kathy, her nephew called and told her that Rob was passed out over his steering wheel at a local gas station and that "he thought [Rob] was dead." ROA.1295. "As any concerned mother would do, Kathy abruptly left work and raced over to the gas station." ROA. 2209-2210. But Rob was already gone. ROA.1297.

"With her son nowhere to be found, Kathy drove to Robert and Ms. Knighton's home hoping to find him there." ROA.2210, 1298. According to Kathy, "I go and knock on the door, and he doesn't come. So I go to beating on the door to

see, you know, what's going on because allegedly he was -- you know, almost [dead]." ROA.1298, 2210. Once "her son finally came out with Ms. Knighton following closely behind, allegedly cussing and screaming at him[,] Kathy told her son to get in the car." ROA.2210.

Kathy testified that once Rob got into the car, she just began to drive. ROA.1298. She thought "I don't know what I'm going to do, because he is really messed up. And if I take him to jail, there's nothing they can do." ROA.1298. "Kathy began driving toward the Ashland square and saw MDOC Officer Steve Belew's car parked outside of his office. As the Benton County Circuit Clerk for the past 18 years, Kathy knew Officer Belew dealt with frequent drug offenders as a probation officer, so she went to him for help." ROA. 2210. Kathy figured "Well, maybe he can give me some advice." ROA.1299. So that is where she took Rob. *Id.* Once they arrived at Belew's office, she told Rob: "We're going in to talk to Mr. Belew and see if he can't give us some advice of what to do with you." ROA.1300.

At the office, "Officer Belew brought Robert into his office while Kathy remained in the waiting room. It was here that Robert admitted to using drugs and told Officer Belew that his wife Ms. Knighton, also under the influence of drugs, was passed out in the house with the children. Out of concern for the children, Officer Belew accompanied Robert and Kathy back to their home." ROA.2110.

Agent Belew testified that Kathy and Rob visited his office, where Rob reported that his wife, Knighton, was unconscious due to drug use, with two young children present in the home. Concerned for the children's safety and a potential overdose, Agent Belew notified the Sheriff's Department and accompanied Kathy and Rob to the residence, carrying standard drug testing equipment in his vehicle as an MDOC probation officer. Upon arrival, the door was locked; the husband knocked without response, and through an open window, Officer Belew and Kathy observed Knighton passed out on the couch. The record would show that at the time Kathy, Rob, and Officer Belew showed up at the home, both children, Stephen and Molly, were also in the house. ROA.931.

According to Belew, Knighton eventually crawled to unlock the door, and her husband assisted her to a chair, inviting Agent Belew and Kathy inside. ROA.812-814, 1357-1362. No one ordered or requested a drug test from Knighton; instead, following an argument between her and her husband, Knighton voluntarily agreed to take a drug test after Rob requested that she do so. *Id.* Agent Belew retrieved a urine test cup from his vehicle, explained its use, and provided it to Rob, who assisted Knighton to the bathroom while Agent Belew and Kathy remained in the living room and kitchen area. *Id.* When Knighton indicated she could not urinate, Agent Belew offered a mouth swab test, which she self-administered at Rob's insistence, with Agent Belew reiterating that participation was optional. *Id.* Rob

handled the swab, placed it in the container, and passed it to Agent Belew, who confirmed a positive result for opiates. *Id.* At that point, Knighton admitted to using fentanyl. ROA.1361.

Belew noted that "the Sheriff's Department had been advised of the Plaintiff being passed out and the children inside the home before we ever went inside." ROA.813. "When the Sheriff arrived, we spoke outside in the driveway and he asked if she was using drugs." *Id.* Belew then "explained what [he] had observed of the Plaintiff being passed out and having to crawl to the door to unlock it and the test results and the Plaintiffs admission of using fentanyl." *Id.* According to Belew, "at this point local law enforcement had arrived, the children were safe and the scene was secure." As a result, "I left the scene and returned to my office and advised my PPAS David Matlock of the events." ROA.814.

According to Sheriff Goolsby, Kathy called him and told him about Rob being passed out at the gas station that morning. ROA.743. "Kathy stated that she wanted [Goolsby] and CPS to come to Rob and Chelsea's home." ROA. 743. According to the Sheriff, he did not believe Kathy had been to Knighton's home at that point. ROA.857. The Sheriff's purpose in going was because Kathy "had found Rob passed out in the car." ROA.858. And Kathy had wanted CPS there so he "just assumed there was something going on with the kids as well." ROA.860. He did not recall Kathy telling him anything else that was going on. *Id.*

When Sheriff Goolsby initially arrived at Rob and Knighton's house around 10:05 am, he spoke with Belew and Belew told him what happened. ROA.810. The Sheriff then spoke with Knighton and Rob to let them know that CPS would be back later to meet with them and that they needed to get the home cleaned up before CPS arrived. ROA.810, 863. According to the Sheriff, Knighton admitted to him that she used fentanyl. ROA.863-864. The Sheriff then left, until CPS notified him that they were ready to go to Rob and Knighton's house. ROA.865. The first time Sheriff Goolsby and CPS case manager, Madeline Hickman ("Hickman"), went to the home at 11:27 am, no one answered. ROA.869. As a result, Sheriff Goolsby and Hickman went to Kathy's home to speak with Stephen, the oldest child. ROA.811, 870.

At around 1:21 pm, Sheriff Goolsby, who along with CPS case manager Madeline Hickman, MDOC agent Belew, Chief Deputy Fortner, and Dan Graves, Kathy's brother, again visited Rob and Chelsea's home. ROA.811, 867. Dan knocked and tried a key, which failed, but Rob eventually answered, claiming he and Knighton were napping. ROA.811, 867. Knighton emerged from the bedroom and began arguing loudly with Hickman about a prior CPS report. ROA.811, 874. Sheriff Goolsby requested that she calm down and warned that if she continued to be uncooperative with CPS he would have no choice but to arrest her. *Id*. Knighton refused to cooperate. *Id*. Based upon Knighton's and Robert's admissions of fentanyl use, Knighton's reported positive drug test, Molly's unresponsiveness, the home's

condition, and Knighton's continued uncooperative behavior, Sheriff Goolsby arrested both for child neglect under Mississippi Code Annotated § 97-5-39. ROA.810-811, 863-864, 874. Knighton was transported to jail by Sheriff Goolsby, and Rob was taken to jail by Deputy Fortner. ROA.811. Sheriff Goolsby then swore out an affidavit for child neglect based on their admitted drug use and reported positive drug test and a Justice Court Judge issued an arrest warrant for both. ROA. 810-811, 821, 833-837. After which, CPS legally placed temporary custody of Stephen and Molly with Kathy, who agreed to care for them as their grandmother.

According to Knighton, however, on or about February 2, 2021, Kathy, assisted by MDOC probation officer Belew, went to Plaintiff's home after finding out that Rob had passed out from apparent drug usage in a car. ROA.19. She claims that Kathy and Belew ordered her to take a drug test, which she refused. *Id.* She alleges they ordered her to the bathroom to obtain a urine sample, which she was not willing or able to do. ROA.20. Finally, she claims Belew allegedly forced her to a couch, held her down, and forcefully swabbed her cheeks and mouth, which allegedly showed the presence of opiates in Knighton's system. *Id.* After which, Kathy allegedly took Knighton's children and left. *Id.*

Knighton then vaguely claims that after Kathy left with the kids, later that evening, Sheriff Goolsby knocked on the door and Rob let him in. ROA.961-965. She alleges Sheriff Goolsby then arrested her and took her to jail. *Id.* Knighton does

not remember any conversation between her and the Sheriff when this happened. *Id*. She does not remember if she was handcuffed. ROA.969. She does not know of "any interaction or conspiracy or any agreement that Sheriff Goolsby and Kathy Graves" had. ROA.976-7. She just knows that her children were initially "taken" by Kathy on February 2, 2021, without CPS involvement and that she was arrested. ROA.980-3. Knighton testified that neither Sheriff Goolsby nor Kathy touched her that day. ROA.962, 1039. She does not remember Rob ever asking his mother to leave. ROA.1039. She also testified that she does not remember Rob ever telling his mom the children could not go with her. *Id*. Notably, despite claiming she was not on drugs, she was not high, and she never had a problem with drugs, Knighton never explained why she did not stop her children from going with Kathy or just go pick up the kids from Kathy's before Sheriff Goolsby arrived. See ROA.903-1097, generally.

On November 29, 2021, the Chancery Court of Benton County heard testimony from Kayla Reno, Family Protection Specialist in Benton County, Rob Graves, Kathy Graves, and Chelsea Knighton regarding the events of February 2, 2021. ROA.1150. In the hearing Kayla Reno, testified that in their emergency family team meeting in February of 2021, Knighton admitted to having using drugs. ROA.1166. Ms. Reno stated that CPS requested nail screens of both Rob and Knighton, but Knighton never completed the test, noting that "Chelsea was asked

continuously but it's still not obtained at this time." ROA.1158. She added that Rob had attended rehab but Knighton did not. Ms. Reno further testified that with regard to the family service plan, both parties had completed the plan except for Knighton's nail screen. *Id.* When asked why she refused to take the nail test ordered by CPS and the Youth Court Referee, Knighton claimed that her nails were always too short for the test, and that at no point between March and September of 2021 did they grow long enough to test. ROA.1264. Ms. Reno notes that the Child Neglect charges from February 2, 2021, were ultimately dropped due to the parties' attendance of a mental health assessment and their ongoing divorce proceedings. ROA.1174. Rob then testified that both he and Knighton were using heroin and fentanyl towards the end of their relationship, up to and including on February 2, 2021. ROA.1177-8.

During the examination of Knighton, Ms. Knighton initially stated that she did not smoke, but when asked what she was smoking in front of the courthouse she stated "I don't consider vaping the same as smoking.". ROA.1256. When asked if she remembered admitting to Judge Shackelford that she needed help because of drug use Ms. Knighton stated: "No. I did not say I needed help because of drug use." ROA.1257. Rather, she claims she admitted to needing help to get her children back; adding: "The way that it was told to me [by CPS and the Youth Court Referee] was that the only way I could get my children back is if I went to a rehab facility for six months is what they said, I think." ROA.1257. She then claimed not to remember

the last time she used prescription drugs but noted "the last time I used prescription drugs was the last CPS investigation." ROA.1258.

Knighton alleges that "Kathy Graves and Belew broke into her home." Yet, in her deposition she stated that Rob, her husband, entered his own home with Kathy and Belew. ROA.931. In fact, she states "I don't remember what I was doing when they came in. But Rob came in and Kathy was behind him, then Steve Belew behind her." ROA.931-2, 1073, see also ROA.1083. ("Rob had a key."). She alleges that Kathy undertook a scheme to take her children, yet she admits the same children were placed with Kathy in 2019 by CPS as a result of similar occurrence where she and Rob were arrested for child neglect in Corinth adding "she didn't keep them in a way a grandmother would keep their grandchildren, you know, to spend time or anything like that. The children – Stephen had been placed with her in 2019." ROA.941.

Similarly, with regard to the incident on February 2, 2021, from which this complaint is based, the deposition testimony of Ms. Knighton can best be described as "I don't remember." ROA.915, 928-1088. For example, when asked whether or not she had ever taken Fentanyl outside of a medical environment, Knighton stated "I just don't know – I don't know", but admits that she has used unprescribed narcotics in the past. ROA.928-9. When asked where she was when Rob, Kathy, and Belew arrived at the house that morning, Knighton stated "I don't know." ROA.931.

She was asked if she remembered people taking pictures of her and Rob's house, to which she stated "no." ROA.956. When asked if she spoke to Rob between the time of his arrival and the time Sheriff Goolsby arrived, she stated "I don't remember." ROA.949. Knighton was asked if anyone accompanied Sheriff Goolsby that afternoon, she similarly stated "I don't remember." ROA.961. When asked specifically about Sheriff Goolsby's actions that morning she stated:

> Q. When Goolsby arrests you in your house, you don't remember anything about what he said or anything --
>
> A. I don't --
>
> Q. -- is that right?
>
> A. -- remember.
>
> Q. Did he put handcuffs on you?
>
> A. (Short pause). I don't remember.

ROA.969. She likewise could not remember if Belew or Kathy were present when Sheriff Goolsby arrived, nor could she remember if she spoke to anyone when she was booked into jail. ROA.962. When asked why Sheriff Goolsby would file a false affidavit against her or if she knew of any time of relationship between Sheriff Goolsby and Kathy Graves she stated "I don't know." ROA.976. Knighton also admits that prior to February 2, 2021, she had never had any type of negative interaction with Sheriff Goolsby. ROA.970.

According to Knighton, Kathy "undertook a course of action to obtain custody of [her] children" by "going through the process of becoming a foster parent." ROA.1023-1030. And by interacting with CPS worker Jennifer Byrd at the Courthouse. ROA.1023-1030. She also believed that Kathy knew judges, attorneys, other court clerks, and police. *Id*. But could not explain how this impacted her case. ROA.1023-1030. According to Knighton, Kathy's "always been controlling, disrespectful, passive aggressive. She's just always been a hateful bitch." ROA. 1035-1040. Knighton could not explain how all actions taken by Belew were at the command or request of Kathy, much less Sheriff Goolsby or Benton County, Mississippi. ROA.1034-1042. According to Belew, Kathy never directed him to go to Knighton's home and never directed him to give Knighton a drug test. ROA.1378-1381. The best Knighton could say was that she believed Kathy testified, either in a Youth Court or Chancery Court hearing, about going to his office earlier that day. ROA.1031-1035. But she could not remember if it was Kathy that testified, or Rob, and she could not remember exactly what the testimony was. *Id*.

While Knighton may have filed a complaint alleging that all these things happened to her, when asked about the incident from which she complains she is unable to corroborate or expound on any of her allegations. See USCS Fed Rules Civ Proc R 56 ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated.").

Namely, she vaguely recalls Sheriff Goolsby arriving at her home on February 2,

2021, after her children left with Kathy, but she cannot remember any conversation

with him during the arrest, whether she was handcuffed, or any prior interactions or

agreements between Sheriff Goolsby and Kathy Graves that might suggest a

conspiracy. Knighton's sheer lack of recollection further supports the testimony of

all other witnesses present.

To reiterate, Rob, Kathy, and Belew stated that when they arrived at Rob and

Knighton's house, Knighton was passed out on the couch and her children were still

at home. Belew and Kathy testified that Knighton was clearly under the influence of

something as she had to crawl to the door to open it. Again, this was sometime

between 8:00 am and 9:00 am on a Tuesday. According to Sheriff Goolsby, Kathy

called him and told him about Rob being passed out at the gas station that morning.

ROA.880-90. "Kathy stated that she wanted [Goolsby] and CPS to come to Rob and

Chelsea's home." *Id.*  According to Sheriff Goolsby, he did not believe Kathy had

been to Rob and Knighton's home at that point. ROA.858.  The Sheriff's purpose in

going was because Kathy "had found Rob passed out in the car." ROA.859. And

Kathy wanted CPS there so he "just assumed there was something going on with the

kids as well." ROA.860.  He did not recall Kathy telling him anything else that was

going on. *Id.* Sheriff Goolsby states that he filled out and signed the affidavit against

Knighton and Rob for using drugs in the presence of their children because they both admitted using drugs, Knighton was uncooperative and cursing at the CPS case worker, and that, to him, she and appeared to be under the influence of something. ROA.873-7, and 890-4. Sheriff Goolsby testified that before placing Knighton and Rob under arrest he did not talk to Kathy about the possibility of charging them. ROA.882-6. According to the Sheriff, Kathy never asked him to arrest Knighton, he never discussed arresting Knighton with Kathy, and Kathy never so much as indicated that he should arrest Knighton. ROA.894-5. And Knighton testified that she does not remember Kathy being around for her arrest. ROA.962. Of note, Kathy testified that she had never reported Chelsea to CPS or any other entity for drug use prior to this instance. ROA.1130.

On the other hand, despite asserting that she was not under the influence of drugs, Knighton provides no explanation for why she did not prevent her children from leaving with Kathy or retrieve them prior to the Sheriff's arrival. She claims that Kathy and Belew broke into her home, yet her deposition testimony indicates that her husband, Rob, entered the residence with his own key, followed by Kathy and Belew. Knighton also acknowledges that her children had previously been placed with Kathy by CPS in 2019 following her and Rob arrest for child neglect, contradicting any implication of an unauthorized scheme. Throughout her deposition, Knighton repeatedly responds with uncertainty, stating "I don't

remember" or "I don't know" regarding key details, including her location upon the arrival of Rob, Kathy, and Belew; whether photographs were taken of the home; any discussions with Rob before Sheriff Goolsby's arrival; the presence of others with Sheriff Goolsby; specific actions or statements by Sheriff Goolsby during the arrest; the presence of Kathy or Belew at the time of the arrest; conversations during her booking into jail; any motive for Sheriff Goolsby to file a false affidavit; or any relationship between Sheriff Goolsby and Kathy Graves. Additionally, she admits to past use of unprescribed narcotics and uncertainty about non-medical fentanyl use, while confirming no prior negative interactions with Sheriff Goolsby.

Nevertheless, the district court found that Knighton "maintains that on the morning of February 2, 2021, she was at home, awake and making coffee when Kathy, Robert, and Officer Belew arrived. Kathy and Officer Belew demanded that she take a drug test, but she told them to get out of her house." ROA.2211. "According to Ms. Knighton, Officer Belew aggressively forced her into a bathroom and stood over her while she tried to provide a urine sample but was unable to do so. He then escorted Ms. Knighton to the couch in the living room where he pinned her down with his knee, grabbed her face, pried open her mouth and forced an oral swab into her mouth." ROA.2211. "Although Officer Belew said the test was positive for opiates, he did not show Ms. Knighton the test and it was later determined the test kit used was expired." ROA.2211. Then, according to the lower court, "Ms.

Knighton does not remember exactly but either Officer Belew or Kathy told her that she would be arrested, and they left with both children." ROA.2211.

The lower court found "Then, according to Ms. Knighton, Sheriff Robert Goolsby arrived at the home upon Kathy's request." ROA.2211. "Officer Belew informed Sheriff Goolsby that Ms. Knighton tested positive for opiates and admitted to using fentanyl. Based on this information, Sheriff Goolsby signed an affidavit swearing that Robert and Ms. Knighton had used drugs in the presence of their children and arrested Ms. Knighton." ROA.2211. Without addressing Knighton's admission of drug use to numerous people, her husband's corroboration thereof, or her uncooperative behavior with CPS workers, the district court concluded that Knighton alleged a constitutional violation because "Sheriff Goolsby did not personally witness Ms. Knighton using drugs in the presence of her children, nor did he see the positive drug test. Ms. Knighton was tested multiple times after her arrest and never tested positive for drugs in a valid test. Nevertheless, based on the defendants' allegations, Ms. Knighton lost custody of her children for over a year and spent over a week in jail until she was released after the charges against her were dropped." ROA. 2211.

## B. Procedural History

This case involves a civil rights action under 42 U.S.C. § 1983 filed by Knighton against Defendants Benton County, Mississippi; Kathy Graves (in her

official and individual capacities); Sheriff Robert Goolsby (in his individual capacity); MDOC Officer Steve Belew (in his official and individual capacities); and John Does 1-10. The action arises from events on February 2, 2021, in Ashland, Mississippi, related to a family dispute involving alleged drug use and child welfare concerns. With respect to Defendants Sheriff Goolsby and Benton County, Knighton alleges violations of her First, Fourth, Eighth and Fourteenth Amendment rights, including unlawful seizure, excessive force, false imprisonment, abuse of process, fabrication of evidence, and interference with familial association, as well as conspiracy and state-law claims.

On May 4, 2023, Sheriff Goolsby and Benton County moved to dismiss all claims. ROA.337. The court denied the motion, reasoning that at that stage in the proceedings, it remained unclear from the parties' contentions and conclusory allegations whether the acts and omissions of Sheriff Goolsby constituted "reckless disregard of the safety and well-being" of the plaintiff, although such a claim appeared plausible on the face of the plaintiff's Complaint. The Court determined that the issue of Sheriff Goolsby's liability should be resolved later in the proceedings, once both parties had submitted sufficient evidence to substantiate their claims and defenses. ROA.388. Accordingly, the Court dismissed the Defendants' Motion to Dismiss with respect to this issue. Furthermore, the Court emphasized that it must accept Ms. Knighton's well-pleaded facts as true, and at this juncture, the

plaintiff need only plead a plausible claim of a violation of her constitutional rights entitling her to relief. ROA.388. Although the defendants contended that Ms. Knighton failed to meet her burden, the Court disagreed, finding that she had clearly alleged violations of her First, Fourth, and Fourteenth Amendment rights. The Court noted that it is abundantly clear any reasonable officer would recognize that falsifying an affidavit and unlawfully arresting the plaintiff without probable cause or reasonable suspicion contravenes her constitutional rights under the law. ROA.387.

After discovery ended, Sheriff Goolsby and Benton County filed their motion for summary judgment. ROA.805. In their motion, Benton County and Sheriff Robert Goolsby asserted (1) Sheriff Goolsby was entitled to qualified immunity, (2) absence of municipal liability as to Benton County, and (3) that Plaintiff failed to establish genuine disputes of material fact. Knighton responded in opposition, conceding her First Amendment claims and her state law claims for assault and battery. ROA.2018. Kathy and MDOC Officer Steve Belew, ROA.1417-2002, each filed Motions for Summary Judgment as well. This appeal arises from the district court's Order Denying Defendants' Motions for Summary Judgment entered June 26, 2025, in *Knighton v. Benton County, Mississippi, et al.*, No. 3:22-cv-56-MPM-RP (N.D. Miss.) (the "Order"). ROA.2209.

Knighton filed one Response in opposition to all the Defendants' motions. ROA.2015-2029. In it, Knighton conceded her First Amendment and assault and battery claims. ROA.2018. Problematically for a qualified immunity (QI) analysis, Knighton did not properly analyze what each individual Defendant did, often broadly referring to "Defendants" throughout her brief. ROA.2017-2043. Moreover, Sheriff Goolsby's opening brief laid out the QI framework, ROA.1385-1416, and Knighton's conclusory allegations did not come close to satisfying her burden to defeat QI. ROA.2035-2038. Instead, Knighton generally relied on conclusory allegations, broad statements of law and cited non-authoritative and non-analogous cases. ROA.2035-2038. But that is not all, as discussed in more detail below, Knighton also abandoned many of her claims by failing to respond to Defendants' arguments. *Compare* ROA.1402-1414 *with* ROA.2025-2043. For the remainder of the state law claims, Knighton merely repeated the elements without applying them to the facts of this case. ROA. 2041-2043. That was not enough to carry her burden at summary judgment. All Defendants filed a Reply pointing out these issues to the district court. ROA.2173-2196.

On June 26, 2025, the district court denied summary judgment, including the claims conceded and abandoned by Knighton, and without addressing qualified immunity, because it found that genuine issues of material fact existed. ROA.2209-2214. But the district court failed to: 1) consider undisputed prior court testimony;

2) perform a QI analysis (or even mention that this was a QI case); 3) determine whether any of these facts were material to any given claim as to Goolsby; and 4) dismiss even the claims conceded or abandoned by Knighton. ROA. 2209-2241. Additionally, the court erroneously determined that, in order to arrest Knighton for child neglect, Sheriff Goolsby could not rely on the representations of an MDOC officer regarding a positive test and perceived drug use, her husband's corroboration of that drug use, the sheriff's own personal observations, reports from CPS, and the individual's prior history; rather, the sheriff was required to personally witness Knighton using drugs in the presence of her children or to personally view the positive test. Because of all this, Defendants timely filed their Notices of Appeal on July 17, 2025. ROA.2231-2232.

## SUMMARY OF ARGUMENT

The district court erred as a matter of law by denying summary judgment and qualified immunity. Even viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that Sheriff Goolsby violated a clearly established constitutional right. The undisputed evidence—Plaintiff's own admissions, CPS corroboration, and sworn affidavits—demonstrates probable cause for her arrest.

The District Court erred in denying summary judgment by disregarding uncontradicted evidence from the Benton County Chancery Court transcript, including testimony from neutral Family Protection Specialist Kayla Reno, which corroborated Defendants' account of the February 2, 2021, incident and demonstrated no genuine issue of material fact. This oversight improperly characterized the case as a "he said, she said" dispute reliant solely on deposition testimony, while ignoring the transcript's details, such as Plaintiff's admission of drug use to CPS, her failure to complete a required nail screen, and corroborating statements from her former husband, Robert Graves, regarding their shared heroin and fentanyl use on the day in question. Pursuant to *Orr v. Copeland*, 844 F.3d 484, 490-91 (5th Cir. 2016), the court may not disregard uncontradicted and unimpeached eyewitness testimony absent evidence of bias, nor may it invert the qualified immunity burden by demanding video or photographic evidence, as this flips

Supreme Court precedent under *Scott v. Harris*, 550 U.S. 372 (2007). The transcript, unchallenged by Plaintiff beyond conclusory allegations, establishes probable cause for the child neglect arrest, negating claims of fabrication or excessive force and requiring reversal with judgment for Appellants.

Additionally, the District Court erroneously denied qualified immunity to Sheriff Goolsby on the Fourth and Fourteenth Amendment false arrest claims. Qualified immunity shields officials unless their conduct violates clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, Sheriff Goolsby relied on sworn information from MDOC Officer Belew regarding Plaintiff's positive opiate test and fentanyl admission, corroborated by Robert Graves, amid immediate concerns for two minor children's safety. This constituted probable cause—or at minimum, arguable probable cause—under *Beck v. Ohio*, 379 U.S. 89 (1964), and *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009), as even mistaken but objectively reasonable beliefs do not defeat immunity. *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000). Plaintiff failed to identify precedent clearly establishing that such reliance violates constitutional rights, and her post hoc claims of coercion or test expiration do not create a genuine dispute, particularly given her admissions in related proceedings. *Ornelas v. United States*,

517 U.S. 690, 696 (1996). Thus, neither prong of qualified immunity is satisfied, warranting reversal.

Additionally, Benton County cannot be held liable under § 1983, as Plaintiff presented no evidence of a municipal policy, custom, or practice that caused any alleged violation. Absent such proof, summary judgment for the County is required. The district court erroneously conflated personal actions of individuals with county liability.

Finally, the court should have dismissed the First Amendment retaliation claims, as Plaintiff explicitly abandoned them in her response to the motions. Similarly, the Eighth Amendment excessive force claims must be dismissed, given Knighton's concession that Sheriff Goolsby did not use any force and of her related state-law claims for assault and battery, which encompass the same factual allegations.

## ARGUMENT

## STANDARD OF LAW: MOTION FOR SUMMARY JUDGMENT

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007); citing Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id. quoting Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id. quoting Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* But "[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show

that the defense is not available." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016); quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (internal quotation marks omitted).

"To do so, a plaintiff must 'identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial.'" *Id. citing Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). "'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' are all insufficient to overcome immunity." *Id. See Reyes v. Hornbeck Offshore Servs., L.L.C.*, 383 F. App'x 442, 443-44 (5th Cir. 2010) (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)). "To survive summary judgment, the plaintiff must present evidence demonstrating that qualified immunity does not apply." *Wood v. Bexar Cty.*, 147 F.4th 534 (5th Cir. 2025).

**ISSUE 1. THE COURT ERRED IN DISREGARDING THE CHANCERY COURT TRANSCRIPT AND THE TESTIMONY PRESENTED THEREIN.**

The District Court erred in denying summary judgment by disregarding uncontradicted evidence from the Benton County Chancery Court transcript, including the testimony of Kayla Reno, a neutral Family Protection Specialist. ROA.2213. The court characterized the case as a "he said, she said" scenario reliant

solely on deposition testimony, stating that "[t]he record lacks undisputed evidence" and noting the absence of photographs or video footage. *Id.* This conclusion improperly ignored the chancery transcript, which corroborates Defendants' account and demonstrates no genuine issue of material fact.

To reiterate, "a good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Orr v. Copeland,* 844 F.3d 484, 490 (5th Cir. 2016) (internal quotation marks omitted). To do so, a plaintiff must "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Id.* "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" are all insufficient to overcome immunity. *Id.*

In denying Goolsby's motion for summary judgment, the district court disregarded the testimony of CPS Family Protection Specialist, Kayla Reno, Knighton, Rob, and Kathy provided in the *Chancery Court Transcript from November 29, 2021,* ROA.1150-1279, the affidavit for arrest and related documents, ROA.810-817, 821—2, 833-837, along with the deposition testimony of Knighton, ROA.898-1098, and Defendants, Kathy Graves, ROA.1280-1335, Sheriff Goolsby,

ROA.840-897, and MDOC Officer Belew. ROA.1340-1384. Specifically, the Court found:

> It is evident that the parties fundamentally disagree on the material facts of this case. The record lacks undisputed evidence, and the matter presents a classic "he said, she said" scenario, with the majority of evidence consisting solely of the parties' deposition testimony. There are no photographs or video footage from the events that took place on February 2, 2021, and the only arguably credible evidence—a purportedly positive but expired drug test—cannot be corroborated by any witness and has since been discarded. Given these circumstances, the Court cannot reasonably adjudicate the matter when the most essential facts remain in dispute.

ROA.2209-2214.

Like *Orr,* this finding is erroneous for two reasons. In *Orr,* the Fifth Circuit reversed the lower court's order denying defendants' motion for summary judgment, where the district court disregarded the testimony of the officer and two eyewitnesses, finding that because there was "no video evidence of the actual shooting" the "testimony of [the officer], the eyewitness, and the 9-1-1 caller . . . should not be accepted until subjected to cross examination." *Orr*, 844 F.3d at 489-90. The Court of Appeals reversed, noting "this finding erroneous for two reasons." *Id.* at 490.

"First, the district court's decision flips Supreme Court precedent on its head." *Id.* at 491. "While *Scott* empowers a district court to disregard testimony that is at odds with video evidence, the holding [of the district court] would prevent summary judgment from being granted in the absence of video evidence, effectively stripping

all officers of qualified immunity if their actions were not recorded." *Id.* "This fundamentally flips the burden back onto the government official." *Id. citing Cf. Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010) ("[O]nce a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."). Additionally, the Court explained:

> Second, the district court was not permitted to disregard the testimony of the two eyewitnesses. There is no evidence to suggest that the pair was biased, and the district court specifically found that the heirs "[did] not offer any evidence to contradict the eyewitnesses' statements." Because their testimony was "uncontradicted and unimpeached," the district court was required to give it credence. Failure to do so amounted to an inappropriate "credibility determination[]."

*Id. citing Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

Applying the proper summary judgment standard, the court determined that Copeland's use of non-lethal force—consisting of measured and ascending responses such as verbal commands, a taser attempt, kicks, punches, and hammer strikes—was objectively reasonable given Bradley's active resistance, flight, and the suspicion of serious drug crimes. Similarly, the lethal force was presumptively reasonable, as undisputed evidence showed Bradley posed a threat of serious harm by repeatedly reaching for Copeland's weapon during a prolonged, life-threatening struggle. The heirs failed to present evidence creating a genuine dispute on these dispositive facts,

thus not overcoming qualified immunity. The judgment was reversed, granting Copeland qualified immunity.

Similarly, in the instant case, in support of their Motion for Summary Judgment Defendants cited the *Chancery Court Transcript on November 29, 2021*, ROA.1150-1279 the incident report for the February incident, ROA.178-185, the affidavit for arrest, along with the deposition testimony of Knighton, Rob, Kathy, Sheriff Goolsby, and Belew. ROA.806, 1385-1416. Notably, the court transcript would show that on November 29, 2021, the Chancery Court of Benton County heard testimony from Kayla Reno, Family Protection Specialist in Benton County, Robert Graves, Kathy Graves, and Chelsea Knighton concerning the events of February 2, 2021. ROA.1151. In the hearing Kayla Reno, testified that in their emergency family team meeting in February of 2021, Knighton admitted to having using drugs. ROA.1166. Ms. Reno stated that CPS requested nail screens of both Rob and Knighton, but Knighton never completed the test, noting that "Chelsea was asked continuously but it's still not obtained at this time." ROA.1158. She added that Rob had attended rehab but Knighton did not. *Id.*

Ms. Reno further testified that with regard to the family service plan, both parties had completed the plan except for Knighton's nail screen. ROA.1158-1162. When asked why she refused to take the nail test ordered by CPS and the Youth Court Referee, Knighton claimed that her nails were always too short for the test,

and that at no point between March and September of 2021 did they grow long enough to test. ROA.1264-1266. Ms. Reno notes that the Child Neglect charges from February 2, 2021, were ultimately dropped due to the parties' attendance of a mental health assessment and their ongoing divorce proceedings. ROA.1174. Rob then testified that both he and Knighton were using heroin and fentanyl towards the end of their relationship, up to and including February 2, 2021. ROA.1177-78. Notably, despite being pressed by Judge Shackleford regarding her admission of drug use, Knighton at no point mentioned any of the events she now claims occurred in the subject complaint.

More importantly, however, the Chancery Court transcript is uncontradicted and unimpeached. Knighton offered no evidence in the District Court to rebut it; instead, Plaintiff simply relied on the allegations in her complaint without further corroboration or explanation, yet the court disregarded the transcript without explanation. This violates summary judgment standards. As held in *Orr v. Copeland*, 844 F.3d 484, 490-91 (5th Cir. 2016), a district court may not disregard uncontradicted eyewitness testimony absent bias or contradiction. In *Orr*, the court erroneously discounted testimony due to the lack of video evidence, flipping the qualified immunity burden. *Id.* at 490. Similarly, here, the District Court's emphasis on absent video or photos inverted the burden, requiring Defendants to produce such evidence rather than crediting uncontradicted testimony. *See also Delta & Pine Land*

*Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008) (prohibiting credibility determinations at summary judgment). Moreover, the allegations of Ms. Knighton are wholly contradicted by the Chancery Court transcript discussing the incident from February 2, 2021. These contradictions are further amplified by her apparent lapse of memory in deposition.

Thus, like *Orr,* the court improperly disregarded the testimony presented in the Chancery Court. Reno's testimony, as a neutral CPS official, is particularly credible and directly undermines Plaintiff's denial of drug use, establishing probable cause for the arrest and negating claims of fabrication or excessive force. The District Court was required to credit this evidence, as it creates no genuine dispute for trial. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). Notably, the reasoning undergirding the denial is identical to that of the denial at the motion to dismiss stage. *See Green v. Thomas*, 129 F.4th 877, 889 (5th Cir. 2025) ("Detective Thomas relies on summary-judgment-stage cases, which of course require a higher burden of proof for plaintiffs than those ruling on motions to dismiss.") *See Craig v. Dallas Area Rapid Transit Authority*, 504 F. App'x 328, 331-32 (5th Cir. 2012); *Buehler*, 824 F.3d at 553-54. Reversal is required, with judgment rendered for Appellants.

**ISSUE 2. THE DISTRICT COURT ERRONEOUSLY DENIED QUALIFIED IMMUNITY TO SHERIFF GOOLSBY**

The defense of qualified immunity protects public officials "sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Roque v. Harvel*, 993 F.3d 325, 331 n.5 (5th Cir. 2021) citing *Joseph*, 981 F.3d at 328 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is "an immunity from suit rather than a mere defense to liability" and should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan,* 555 U.S. 223, 231-232 (2009). "Although nominally a defense, the plaintiff has the burden to negate the defense once properly raised." *Brown v. Wilkinson Cnty. Sheriff's Dep't*, (S.D. Miss. 2017); citing *Poole v. Shreveport,* 691 F.3d 624, 627 (5th Cir. 2012).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Vincent,* 805 F.3d at 547 (internal quotation marks omitted). The Fifth Circuit has similarly written that, in the qualified immunity context, "[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden on plaintiffs." *Pierce v. Smith,* 117 F.3d 866, 872 (5th Cir. 1997). Making the plaintiff's burden in this context even more difficult, the Supreme Court wrote in *City and County of San*

*Francisco v. Sheehan,* 575 U.S. 600 (2015), that, to establish that any supportive precedent was "clearly established," the plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals."

Turning now to the question of whether Goolsby was entitled to qualified immunity for the Fourth and Fourteenth Amendment false arrest claims, applying the correct evidentiary standard for summary judgment articulated above, and giving full weight to the undisputed eyewitness testimony, the district court clearly erred in denying Goolsby's motion for summary judgment on qualified immunity grounds. Notably, Plaintiff failed to identify a single case clearly establishing that, in an arrest for child neglect, an officer's reliance on: (a) reports from three eye witnesses that Plaintiff admitted to using fentanyl; (b) testimony from an MDOC Probation Officer that Plaintiff tested positive for opiates and admitted to using fentanyl; (c) corroborating statements from her husband at the time, Rob; and (d) the immediate concern for the safety of two minor children; violates clearly established constitutional rights of which a reasonable person would have known.

### A. Fourth & Fourteenth Amendment Claims

Qualified immunity shields government officials performing discretionary functions unless their conduct violates clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982). The inquiry is twofold: (1) whether a constitutional right was violated, and (2) whether the right was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, neither prong is satisfied. Sheriff Goolsby relied on: (a) sworn information from MDOC Officer Belew that Plaintiff tested positive for opiates and admitted using fentanyl; (b) corroborating statements from Robert Graves; and (c) the immediate concern for the safety of two minor children. ROA.2209-2214.

Probable cause exists when facts within an officer's knowledge are sufficient for a reasonable person to believe an offense has been committed. *Beck v. Ohio*, 379 U.S. 89 (1964). At minimum, Sheriff Goolsby had arguable probable cause—a complete defense to a false arrest claim. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009). Plaintiff's post hoc claim that the drug test was expired or coerced does not negate probable cause. Courts have consistently held that even mistaken beliefs do not defeat qualified immunity when objectively reasonable. *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000). The district court failed to apply this standard and instead treated credibility disputes as dispositive, contrary to *Scott v. Harris*, 550 U.S. 372 (2007), which requires the court to disregard a party's version that is blatantly contradicted by the record. Given Knighton's admissions of fentanyl use to MDOC Officers, CPS and in related proceedings, Sheriff Goolsby's reliance on that information was reasonable and constitutionally sound—whether

Sheriff Goolsby personally witnessed Knighton use drugs or the positive test is immaterial to the probable cause analysis. *Ornelas v. United States*, 517 U.S. 690, 696, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); see also *United States v. Jones*, 239 F.3d 716, 718-19 (5th Cir. 2001) ("The officers had probable cause to search based on nothing more than community complaints of drug sales and a mere declaration against penal interest that identified the apartment as the source of drug sales.") As a result, Sheriff Goolsby is entitled to qualified immunity.

Plaintiff claims that Sheriff Goolsby and others violated her Fourth and Fourteenth Amendment rights by causing her to be prosecuted, arrested, and detained without probable cause and without due process of law. Specifically, she alleges:

> On February 2, 2021 Defendant Goolsby enters the home and arrest Knighton without conversation. Ex. C, Knighton p. 64. Knighton does not remember Defendant Goolsby saying much of anything before or after the arrest took place. Ex. C, Knighton p. 66. Knighton later learned that Defendant Goolsby signed a false affidavit accusing Knighton of using illegal drugs in the presence of her children. Ex D, Goolsby Affidavit.

ROA.2019. In support of the same, she claims "[t]he only evidence put forward by the Defendants is the claim that Chelsea admitted drug use, but this claim is rebutted by Chelsea and multiple drug tests." ROA.2031. Notably, however, all of the

referenced drug tests occurred after the arrest and none of them tested for fentanyl—the drug she admitted to using. ROA.2249 ¶ 25. In support of her claims, though she was unable to remember any specifics from the event in deposition and without addressing the inherent contradictions between her allegations in the complaint and the Chancery Court transcript, Plaintiff simply argues "if a jury finds that the statements were false, then Chelsea prevails. If a jury finds that the statements made by the Defendants were truthful, then Chelsea loses." ROA.2031.

As a preliminary matter, although the Fourteenth Amendment is relevant because it applies the Fourth Amendment to the states, Plaintiff's claims of unlawful arrest and detention should be analyzed under the Fourth Amendment and not under the Fourteenth Amendment's Due Process Clause. *Id. See Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 814 (5th Cir. 2010) ("Cuadra's Fourteenth Amendment claims are based on alleged pretrial deprivations of his constitutional rights and, under the holding in *Albright*, such claims should be brought under the Fourth Amendment.") (citing *Albright v. Oliver*, 510 U.S. 266, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (plurality opinion)); *Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994) (holding that while the plaintiff alleged that her arrest and detention violated both the Fourth and Fourteenth Amendments, her claim was "properly considered under the Fourth Amendment, the more specific constitutional right implicated by her allegations"); *see also Castellano*, 352 F.3d at 953 ("The initiation

of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example . . . .").

Clearly established Fourth Amendment law at the time of the complained of conduct provided that an arrest must be based on probable cause. *See, e.g., Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009). Probable cause exists when "the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 204 (internal quotation marks and citations omitted). Although generally "a grand jury indictment . . . itself establishes probable cause," *Campbell v. City of San Antonio*, 43 F.3d 973, 976 (5th Cir. 1995), we here examine the alleged pre-indictment events because Bosarge claims that the grand jury proceedings were tainted by Fulton's misrepresentations. *See McAllister v. Desoto Cnty., Miss.*, 470 F. App'x 313, 319 n.4 (5th Cir. 2012) (per curiam).

In *Bosarge* the Court noted: "we first identify the allegations that are not entitled to the assumption of truth." *Id. citing Iqbal*, 556 U.S. at 680. "We will not assume the truth of Bosarge's claim that the officers 'acted intentionally or recklessly in falsely identifying' him as the person whom they witnessed meeting with Isom in the Best Buy parking lot." *Id.* "The Supreme Court and our court have found similar

claims to be too conclusory to survive a motion to dismiss without further allegations." *See id.* at 680-81 (declining to assume the truth of the conclusory allegation that petitioners "'knew of, condoned, and willfully and maliciously agreed to subject [respondent]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'" (second alteration in original) (citation omitted)); see also *Morin v. Caire*, 77 F.3d 116, 121 (5th Cir. 1996) ( dismissal proper where the complaint alleged that an officer "'knew, or should have known, that the statements of [a witness] were false,' without pleading factual allegations indicating that [the] statement[s] are indeed false, or facts indicating  that no reasonable police officer would have believed [the] statement[s]"); and s*ee Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) ( "[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'" (quoting *Twombly*, 550 U.S. at 557 n.5)).

Knighton broadly alleges Sheriff Goolsby submitted a false affidavit and arrested her without probable cause, violating her Fourth Amendment rights. Sheriff Goolsby's knowledge at the time of arrest included:

- Kathy's report that her son was found passed out in his car and request for Child Protective Services involvement. ROA.858-60.

- MDOC Officer Belew's statement that Knighton tested positive for opioids, admitted to fentanyl use within 48 hours, and was observed passed out, crawling to the door. ROA.860-63.

- Knighton's admission to using Fentanyl to Sheriff Goolsby. ROA. ROA.863-864, 884.

- The presence of Knighton's children in the home, raising child neglect concerns under Miss. Code Ann. § 43-21-105 (defining neglect as failure to provide proper care). ROA.883-84.

These facts, corroborated by Belew, Graves, and Chancery Court testimony (e.g., Plaintiff's drug use admissions to CPS), establish probable cause for child neglect and support all statements made in the affidavit for arrest. ROA.858-879, 884-85, 890-92. Knighton's vague deposition testimony ("I don't remember") and lack of evidence contradicting Sheriff Goolsby's affidavit fail to show a Fourth Amendment violation. To defeat qualified immunity, Knighton must cite authority demonstrating that, as of February 2021, an arrest based on the report of a positive drug test from an MDOC officer, corroborated witness statements, officer's observations, and an admission of recent drug use in the presence of children violated a clearly established right. No such precedent exists.

Sheriff Goolsby's reliance on the statements of Agent Belew and Kathy, coupled with his own observations, was objectively reasonable. With regard to Knighton's admission of fentanyl use to Sheriff Goolsby, though she now claims she "denied ever 'admitting' to any drug use…" she also concedes "Knighton does not remember Defendant Goolsby saying much of anything before or after the arrest took place."

ROA.963. Knighton also acknowledges no prior adverse interactions with Sheriff Goolsby, and her allegation of a false affidavit is unsupported by evidence of malice or fabrication. ROA.851. The doctrine of qualified immunity encompasses reasonable errors, and Sheriff Goolsby's conduct does not evince incompetence or a knowing violation of law.

Sheriff Goolsby is entitled to qualified immunity in his individual capacity, as: (1) no Fourth Amendment violation occurred due to the presence of probable cause, and (2) his actions were objectively reasonable in light of clearly established law. As established, Sheriff Goolsby possessed probable cause for Knighton's arrest based on: the reports of drug use by Knighton's mother-in-law, Kathy, and Officer Belew; Officer Belew's report of Knighton's positive drug test; her admission of fentanyl use; and her observed impairment in the presence of her children. These circumstances align with Mississippi's definition of child neglect. Knighton's inconsistent and vague deposition testimony, including admissions of prior narcotic use and failure to complete CPS-ordered drug tests, does not create a genuine issue of material fact to rebut probable cause. Moreover, subsequent Chancery Court proceedings on November 29, 2021, corroborated the underlying concerns for the children through testimony from CPS, Rob, and Kathy, as well as Knighton's own admissions. Knighton's assertion that Sheriff Goolsby's affidavit was false constitutes a mere allegation of taint, unsupported by evidence that he withheld or

fabricated information, and is insufficient to overcome the independent intermediary doctrine.

The independent intermediary doctrine "'becomes relevant when . . . a plaintiff's claims depend on a lack of probable cause.'" *Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) (quoting *Buehler*, 824 F.3d at 554). "Under the independent-intermediary doctrine, 'if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation. . . insulating the initiating party.'" *Trevino v. Iden*, 79 F.4th 524, 531 (5th Cir. 2023) (quoting *Buehler*, 824 F.3d at 553). "This is true even if the independent intermediary's action occurred after the arrest or if the arrestee was never convicted of a crime." *Wilson*, 33 F.4th at 208 (quoting *Buehler*, 824 F.3d at 554). Here, a warrant was issued for Knighton's arrest by the Justice Court Judge. ROA.167.

In response, Knighton alleged, without elaboration, that the independent intermediary doctrine does not apply because "the false statements presented to the judge nullify the doctrine in this case." ROA.2031. The warrant for her arrest was issued by the Justice Court Judge on February 3, 2021. ROA.837. Knighton failed to explain what "false statements" were presented to the judge. It is black letter law that "[w]hen preparing a warrant affidavit, an officer may rely upon information from other officers." *Bennett v. Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989).

Here, even excluding the statements that Knighton made to the Sheriff herself, the district court found that "Officer Belew informed Sheriff Goolsby that Ms. Knighton tested positive for opiates and admitted to using fentanyl. Based on this information, Sheriff Goolsby signed an affidavit swearing that Robert and Ms. Knighton had used drugs in the presence of their children and arrested Ms. Knighton." ROA.2211. Neither Knighton nor the district court demonstrated that Sheriff Goolsby *knew* these allegations to be false on February 2, 2021, when he applied for and received the warrant from the judge. Furthermore, the drug test offered by Knighton, which did not test for fentanyl and were conducted after her arrest, cannot possibly rebut her admission of using fentanyl on February 2, 2021. The independent intermediary doctrine applies.

Accordingly, Sheriff Goolsby is entitled to qualified immunity, as his actions did not violate clearly established law and were objectively reasonable. Again, qualified immunity shields officials unless the plaintiff shows (1) a constitutional violation and (2) that the right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, Plaintiff failed both prongs. First, no constitutional violation occurred. Goolsby's affidavit and arrest were based on reliable information from MDOC Agent Belew: Plaintiff's positive drug test for opiates and admission to fentanyl use in the children's presence. ROA.810. Probable cause exists if facts within an officer's knowledge warrant belief by a prudent person that an offense

occurred. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Goolsby did not personally administer the test but relied on Belew's contemporaneous report, corroborated by the chancery transcript. This establishes probable cause for child neglect under Miss. Code Ann. § 97-5-39, defeating claims of unlawful seizure, false imprisonment, and fabrication. Even assuming a violation, it was not clearly established. No precedent holds that an officer lacks probable cause when relying on a fellow officer's report of a positive drug test and admission in a child welfare context. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (requiring specificity). The District Court's denial, based on disputed facts, ignored uncontradicted evidence and improperly shifted the burden. See Orr, 844 F.3d at 490. Qualified immunity must be granted.

## ISSUE 3. THE DISTRICT COURT FAILED TO PERFORM A QUALIFIED-IMMUNITY ANALYSIS

A fundamental error in this case is that the district court did not conduct a QI analysis at all, much less one for each individual defendant as the law demands. *Norris v. Williams*, 776 F. App'x 619, 622 (11th Cir. 2019) (explaining that "courts are required to perform an independent qualified immunity analysis for each defendant"). In fact, the summary judgment order never mentions qualified immunity nor does it apply the requirements. This Court has made clear that such an

omission cannot stand because it "violate[s] the tenet that qualified immunity questions should be resolved at the earliest possible stage in the litigation." *See Randle*, 666 F. App'x at 336 (cleaned up) (reversing district court's failure to conduct a QI analysis).

When the district court failed to perform a qualified-immunity analysis in *Randle*, this Court remanded with instructions. 666 F. App'x at 337 ("For the foregoing reasons, we REVERSE the district court's order to the extent it failed to address qualified immunity and REMAND to the district court for reconsideration of whether each defendant is entitled to qualified immunity."); *see also McDonald v. McCelland*, 779 F. App'x 222, 225 (5th Cir. 2019) ("In these circumstances— where . . . the district court failed to address half of the qualified-immunity inquiry— we exercise our discretion to send the excessive-force question back for further consideration.").

But a different path should be taken here. As has been done in other cases, this Court should exercise its discretion to decide the immunity issue in the face of the district court's implicit denial. *Liberty Mutual Ins. Co. v. Louisiana Dept. of Ins.*, 62 F.3d 115, 117-18 (5th Cir. 1995); *see also Burnikel v. Fong*, 886 F.3d 706, 710 n.3 (8th Cir. 2018) ("To the extent the district court failed to conduct an individualized qualified immunity analysis for each officer, we do so here."); *Lopez v. Shiroma*, 668 F. App'x 804, 806 (9th Cir. 2016) (explaining that, because

"qualified immunity is a question of law[,] it is [ ] within our discretion to take up in the first instance"). Such discretion is especially justified, since "[w]hether an asserted federal right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'" *Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (quoted case omitted); *see also Lopez*, 668 F. App'x at 806.

A major problem for Knighton in this case is that neither counsel nor the district court has ever pointed to a factually-similar case, from an authoritative jurisdiction, that could be said to have "clearly established" any of Goolsby's conduct as unconstitutional. In the response to summary judgment, Knighton made conclusory allegations and pointed only to general propositions of law and factually different cases that in no way placed Sheriff Goolsby's conduct "beyond debate." ROA.2025-2043. Applying the QI standards to this case, there is no governing authority holding that Kathy acted objectively unreasonable under clearly established law. In sum, this Court has reiterated that "[t]he qualified-immunity doctrine makes" obtaining "money damages from the personal pocket of a law enforcement officer" "difficult in every case." *See Morrow*, 917 F.3d at 874. In that same opinion, it was explained that QI presented a "heavy burden" for plaintiffs and that the denial of QI is an "extraordinary remedy." *Id*. at 874-76. Since Knighton did not demonstrate that Sheriff Goolsby acted objectively unreasonably under clearly established law, the district court erred in denying QI.

**ISSUE 4. THE DISTRICT COURT ERRONEOUSLY ALLOWED TO PROCEED THE ABANDONED FIRST AMENDMENT RETALIATION CLAIMS**

The district court erroneously allowed to proceed the First Amendment Retaliation claims, despite Plaintiff's explicit abandonment of the same. See Response to MSJ. Pg. 2. This Court should reverse and dismiss these claims.

**ISSUE 5. THE DISTRICT COURT ERRONEOUSLY ALLOWED TO PROCEED THE ABANDONED EIGHTH AMENDMENT EXCESSIVE USE OF FORCE CLAIMS.**

Similarly, Knighton's Eighth Amendment excessive force claims were abandoned. The Eighth Amendment applies to convicted prisoners, not pretrial detainees or arrestees like Knighton. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Any excessive force claim here arises under the Fourth Amendment, yet Plaintiff did not contest abandonment in her response. ROA.2017. More importantly, when asked if Sheriff Goolsby used force against her during the arrest, Ms. Knighton stated "no." ROA.993-94. Accordingly, any such claims against Sheriff Goolsby should be dismissed.

**ISSUE 6. VICARIOUS LIABILITY IS NOT APPLICABLE TO § 1983 SUITS**

As a threshold matter, § 1983 does not "create supervisory or *respondeat superior* liability." *Oliver v. Scott,* 276 F.3d 736, 742 & n.6 (5th Cir. 2002*)*; *see also Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987) (citations omitted) ("Under §

*1983*, supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability."). "To state a cause of action under *§ 1983*, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Jolly v. Klein,* 923 F. Supp. 931, 943 (S.D. Tex. 1996) (citing *Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir. 1992)); *see also see also Barnhill v. Hildreth-White,* No. 21-50646, 2022 U.S. App. LEXIS 24143, 2022 WL 3709815, at *1 (5th Cir. Aug. 26, 2022) ("[C]onclusional assertion about [a] defendants' supervisory liability is insufficient to create a genuine factual dispute regarding § 1983 supervisory liability.") (*citing Freeman v. Tex. Dep't of Criminal Justice,* 369 F.3d 854, 860 (5th Cir. 2004)).

Thus, supervisory officials, such as Sheriff Goolsby, may be held liable for a *Section 1983* violation only if they either were personally involved in the constitutional deprivation or if there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins,* 828 F.2d at 304. The Sheriff is not subject to liability merely by virtue of his office. *Williams v. City of Jackson*, 2022: U.S. Dist. Lexis 178486; WL 4715706 (S.D. Miss. 2022); citing *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983) (explaining that personal involvement, not mere supervisory liability, is required to state a *§1983* claim). *James v. Harris County*, 577 F.3d 612, 617-18 (5th Cir. 2009).

Plaintiff's allegations against Sheriff Goolsby are even less factually specific than those found insufficient in *Twombly* and *Iqbal*. *Williams v. City of Jackson*, 2022: U.S. Dist. Lexis 178486; WL 4715706 (S.D. Miss. 2022). Plus, even if Plaintiff had alleged facts sufficient to demonstrate a violation of a county policy "violating [County] policy does not equate to a constitutional violation 'if constitutional minima are nevertheless met.'" *Williams v. City of Jackson*, 2022: U.S. Dist. Lexis 178486; WL 4715706 (S.D. Miss. 2022); (citing *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996)). Moreover, plaintiff has neither presented any evidence, nor alleged the existence of an "an official policy promulgated by the municipality's policymaker [that] was the moving force behind, or actual cause of the constitutional injury." *James*, 577 F.3d at 617.

Again, Knighton alleges, "[u]pon information and belief, all actions taken by Belew were at the command and/or request of Graves," thus conceding that any alleged bad act by Belew was not committed at the instruction of Sheriff Goolsby or Benton County, Mississippi. ROA.19. Knighton admits that neither Belew, nor Kathy were employed by the Benton County Sheriff's Department thus conceding that any alleged act by Belew was not committed at the instruction of Sheriff Goolsby. ROA.1336-38. The only claims relating to Sheriff Goolsby show that he was given information from an MDOC officer[1] that Knighton admitted to the use of

---

[1] *See Miss. Code Ann. § 25-1-109.*

fentanyl in the presence of her child, ROA.20, and that her husband had been found passed out in a vehicle due to drug usage. ROA.19. When Sheriff Goolsby arrived with CPS investigator Madeline Hickman to investigate the allegations, Knighton again admitted to using fentanyl. ROA.864, 890-91. It was not until she refused to cooperate and began arguing with and yelling at the CPS worker that the determination was made to place her under arrest. ROA.885-90. Accordingly, Sheriff Goolsby signed an affidavit for Knighton's arrest for child neglect, citing the admitted use of drugs in the presence of children. ROA.20.

Regarding Benton County, Knighton has not produced any evidence suggesting that Belew, an agent with MDOC, was employed by Benton County, but instead, simply claims "Belew was acting as a law enforcement officer in his MDOC attire on behalf of Benton County." ROA.1336-38. MDOC, or, the Mississippi Department of Corrections, is a state agency, separate and distinct from Benton County, Mississippi. Thus, Knighton has failed to state a claim entitling her to relief. As a result, any and all of Plaintiffs § 1983 claims against Benton County couched on a theory of vicarious liability/respondeat superior should be dismissed.

## ISSUE 7.   STATE LAW CLAIMS

Knighton's state law claims fare no better.  They too must be dismissed. Some of her claims are covered by the Mississippi Tort Claims Act ("MTCA") which

makes them immediately reviewable by this Court. *Lampton v. Diaz*, 661 F.3d 897, 899 (5th Cir. 2011) (per curiam) ("The denial of immunity under Mississippi law, like a denial under federal law, is appealable under the collateral order doctrine."). The others are "inextricably intertwined" with the individual federal claims against her, therefore, this Court has jurisdiction to address them too. *Hawkland*, 860 Fed. Appx. at 328-329.

## A. __Knighton Conceded Her Assault & Battery Claim__.

Knighton conceded her assault and battery claim. ROA.2018. Despite this, the district court still did not dismiss it. Furthermore, this claim was barred by the one-year SOL as it is an intentional tort.  Miss. Code Ann. §15-1-35. Knighton's claims allegedly arose on February 2, 2021, ROA.19, and she did not file her Complaint until April 14, 2022. ROA17. It is barred.

## B. __Menace/ Intentional Infliction of Emotional Distress Claim Failed.__

The tort of menace is tantamount to intentional infliction of emotional distress. *Jones v. City of Hattiesburg*, 228 So. 3d 816, 819, fn. 5 (Miss. Ct. App. 2017) (citing Guthrie v. J.C. Penny Co., 803 F.2d 202, 210-11 (5th Cir. 1986)). The standard for an intentional-infliction- of-emotional-distress claim is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent, or reckless. *Little v. Collier*, 759 So. 2d 454, 457 (¶13) (Miss. Ct. App. 2000) (citing Morrison v. Means, 680 So. 2d 803, 806 (Miss. 1996)). The Mississippi

Supreme Court has held that "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Speed v. Scott*, 787 So. 2d 626, 630 (¶ 19) (Miss. 2001) (quoting Jenkins v. City of Grenada, 813 F. Supp. 443, 446 (N.D. Miss. 1993)).

Knighton failed to show that Sheriff Goolsby acted with malice, his actions are ones that evoke outrage, intended to harm Knighton, and that Knighton's emotional distress was foreseeable. *Compare with Smith v. Malouf*, 722 So. 2d 490 (Miss. 1998). Again, the only claims relating to Sheriff Goolsby show that he was given information from an MDOC officer[2] that Knighton had admitted to the use of fentanyl in the presence of her child, ROA.20, and that her husband had been found passed out in a vehicle due to drug usage. ROA.19. When Sheriff Goolsby arrived with CPS investigator Madeline Hickman to investigate the allegations, Ms. Knighton again admitted to using fentanyl. ROA.864, 890-91. It was not until she refused to cooperate and began arguing with and yelling at the CPS worker that the determination was made to place her under arrest. ROA.885-90. Accordingly, Sheriff Goolsby signed an affidavit for Plaintiff's arrest for child neglect, citing the admitted use of drugs in the presence of children. ROA.20. Said conduct simply does not "shock the conscience."

---

[2] *See Miss. Code Ann. § 25-1-109:*

**C. Malicious Interference with Familial Relationships Claim Failed.**

Sheriff Goolsby argued in his summary judgment brief that it was unclear if Mississippi even recognized this claim, as there was no Mississippi case law adopting it. And the seminal case on it appeared to be a Virginia Supreme Court case, *Wyatt v. McDermott*, 283 Va. 685 (Va. 2012), which had never been cited by a Mississippi Court. Knighton never responded to Defendants' argument. ROA. 2025-2043. Therefore, she abandoned this claim. *Black*, 461 F.3d at 588 n.1. The district court erred in not dismissing it.

**D. Malicious Prosecution/ False Arrest Claims Failed.**

These claims also failed and the district court erred in not dismissing them. The elements of the tort of malicious prosecution are: (1) The institution of a proceeding; (2) by, or at the insistence of the defendant; (3) the termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceedings; (6) the suffering of injury or damage as a result of the prosecution. *McClinton v. Delta Pride Catfish, Inc.*, 792 So. 2d 968 (Miss. 2001).

In response, Knighton merely laid out the elements of this tort and then made the conclusory statement that "Defendant Belew and Graves started the prosecution when they influenced the sheriff's decision to charge and arrest Chelsea." ROA.2042. There is no evidence whatsoever that Goolsby's state of mind was

malicious. ROA.2039. In fact, all the evidence and Knighton's own deposition testimony was to the contrary. The only evidence of Sheriff Goolsby's state of mind was his testimony that he was worried about the children and that his daughter and Knighton were childhood friends. Compare ROA.957-969 with ROA.845-894. This claim must be dismissed.

### E. Conspiracy Claim Fails.

Conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Knighton admitted that she had no evidence of a conspiracy between Kathy and Sheriff Goolsby. ROA.975-979. Knighton also could not explain how all actions taken by Belew were at the command or request of Kathy, much less Sheriff Goolsby or Benton County, Mississippi. ROA.639-640. According to Belew's testimony, Kathy never directed him to go to Knighton's home and never directed him to give Knighton a drug test. ROA.1378-1382. In her response, Knighton again failed to address Defendants' arguments, thereby abandoning this claim. *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006). The district court erred in not dismissing it.

### CONCLUSION

Plaintiff has failed to state a claim entitling her to relief against Defendants, Benton County, or Sheriff Goolsby. Benton County, Mississippi, cannot be held

liable on a theory of vicarious liability under § 1983 and is shielded from liability for Plaintiff's state law claims by the immunities afforded by the MTCA. Sheriff Goolsby, cannot be held liable on a theory of vicarious liability under § 1983 and is shielded from liability for state law claims by the immunities afforded by the MTCA; and he is shielded from liability by the doctrine of qualified immunity. Therefore, Defendants Motion for Summary Judgment should be granted.

WHEREFORE, PREMISES CONSIDERED, Sheriff Goolsby and Benton County, Mississippi respectfully pray that this Court dismiss the Plaintiff's claim with prejudice and award them any and all attorney's fees associate with the same. RESPECTFULLY SUBMITTED this the 13th day of November, 2025.

Respectfully submitted,

Benton County, Mississippi; and
Robert Goolsby
Appellants

By:*/s/Wesley C. Pinson*
Wesley C. Pinson (MSB#106508)
Robert J. Dambrino III (MSB#5783)
Attorneys for Sheriff Goolsby and Benton County, Mississippi

Of Counsel:
Gore, Kilpatrick & Dambrino PLLC
Attorneys at Law
P.O. Box 901
Grenada, MS 38902-0901
Ph.   662.226.1891
Fx.   662.226.2237
Eml.  wpinson@gorekilpatrick.com
Eml.  rdambrino@gorekilpatrick.com

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 12,999 words.


2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman, 14-point font, except for the footnotes, which are proportionally-spaced typeface using Microsoft Word in Times New Roman, 12-point font.


        THIS the 13th day of November, 2025.


                                        */s/Wesley C. Pinson*
                                        Wesley C. Pinson (MSB#106508)


## CERTIFICATE OF SERVICE

I, the undersigned Wesley C. Pinson, one of the attorneys for defendants Benton County, Mississippi, and Robert Goolsby, do hereby certify that on this, the 14th day of October, 2025, the foregoing document was filed with the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

THIS the 13th day of November, 2025.

/s/Wesley C. Pinson
Wesley C. Pinson (MSB#106508)